# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v PARKS

Docket No. 162086. Argued on application for leave to appeal March 2, 2022. Decided July 28, 2022.

Kemo K. Parks was convicted by a jury in the Genesee Circuit Court, Celeste D. Bell, J., of first-degree premeditated murder, MCL 750.316(1)(a); carrying a concealed pistol, MCL 750.227(2); and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. In 2016, Parks was 18 years old when his older cousin, Dequavion Harris, shot and killed the victim in the parking lot of a convenience store. According to a witness, prior to the murder, Parks and Harris spoke to each other in low voices and whispers in the back seat of a car parked outside the convenience store. Parks then gave a gun to Harris. Both men entered the store, and Harris exited to the parking lot a short time later. Parks remained inside the store. Thereafter, the victim, who was sitting in his car in the parking lot, was shot and killed. At trial, the prosecution's theory was that Harris and Parks planned to kill the victim in retaliation for the prior murder of Harris's cousin. The prosecution charged Parks with first-degree premeditated murder under an aiding-and-abetting theory. Parks was convicted and sentenced to mandatory life imprisonment without the possibility of parole for his conviction of first-degree murder, to be served consecutively with the mandatory two-year minimum for felony-firearm and concurrently to 24 to 60 months' imprisonment for his conviction of carrying a concealed pistol. Defendant appealed in the Court of Appeals, and the Court of Appeals consolidated his case with Harris's case. In an unpublished per curiam opinion issued August 13, 2020 (Docket Nos. 346586 and 346587), the Court of Appeals, MURRAY, C.J., and CAVANAGH and SWARTZLE, JJ., affirmed Harris's and Parks's convictions and sentences, with the exception of ordering a limited remand in Parks's appeal to redetermine a portion of Parks's restitution order. The Court of Appeals specifically rejected Parks's challenge to his sentence as cruel and/or unusual punishment under the federal and state Constitutions. Parks sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on the application, directing the parties to address whether the United States Supreme Court's decisions in *Miller v Alabama*, 567 US 460 (2012), which held that imposing mandatory sentences of life imprisonment without the possibility of parole on homicide offenders who were under 18 years old at the time they committed the offense was prohibited by the Eighth Amendment, and *Montgomery v Louisiana*, 577 US 190 (2016), which held that *Miller* applied retroactively, should be applied to defendants who are over 17 years old at the time they commit a crime and who are convicted of murder and sentenced to mandatory

life without parole under the Eighth Amendment of the United States Constitution or Const 1963, art 1, § 16, or both. 508 Mich 940 (2021).

In an opinion by Justice WELCH, joined by Chief Justice MCCORMACK and Justices BERNSTEIN and CAVANAGH, the Supreme Court, in lieu of granting leave to appeal, *held*:

Mandatorily subjecting 18-year-old defendants convicted of first-degree murder to a sentence of life imprisonment without the possibility of parole violates the principle of proportionality derived from the Michigan Constitution and thus constitutes unconstitutionally cruel punishment under Const 1963, art 1, § 16; Parks's automatic sentence of life without parole was unconstitutional; and while a judge can still sentence an 18-year-old to life without parole, Parks and other 18-year-old defendants convicted of first-degree murder are entitled to the full protections that exist within the individualized sentencing procedure of MCL 769.25 prior to that determination.

1. The Eighth Amendment of the United States Constitution provides that excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. Article 1, § 16 of the 1963 Michigan Constitution prohibits cruel *or* unusual punishment; therefore, Michigan's provision is broader than the federal Eighth Amendment. The United States Supreme Court in *Miller* held that mandatory life without parole for a juvenile convicted of a homicide offense was unconstitutional because it precludes consideration of the juvenile's chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. While there was no legal support for extending *Miller*'s protections under the Eighth Amendment, *Miller* and *Montgomery* were persuasive to the extent they held that juveniles are constitutionally different from adults for purposes of imposing a life-without-parole sentence, and that general proposition was adopted under the Michigan Constitution. However, United States Supreme Court jurisprudence was not followed to the extent that it drew the line for defining the class of defendants who are entitled to individualized sentencing to those under the age of 18. To determine where to draw the new line under Michigan's constitutional provision, scientific and social-science research regarding the characteristics of the late-adolescent 18-year-old brain was considered. In the punishment context, science has always informed what constitutes "cruel" or "unusual" punishment in regards to certain classes of defendants. Late adolescence—including the age of 18—is a key stage of development characterized by significant brain, behavioral, and psychological change. The key characteristic of the adolescent brain is exceptional neuroplasticity, which is a critical period of cognitive development for young adults that has significant consequences on their behavior. Late adolescents are hampered in their ability to make decisions, exercise self-control, appreciate risks or consequences, feel fear, and plan ahead. Thus, this period of late adolescence is characterized by impulsivity, recklessness, and risk-taking. This period of development also explains why late adolescents are more susceptible to negative outside influences, including peer pressure. Finally, these hallmark features of the developing brain render late adolescents less fixed in their characteristics and more susceptible to change as they age. This evolving understanding of a juvenile's neurological and psychological development is reflected generally in Michigan statutory provisions that treat 18-year-olds differently than other adults.

2. Michigan's Constitution requires that sentencing decisions be proportional. *People v Bullock*, 440 Mich 15 (1992), citing *People v Lorentzen*, 387 Mich 167 (1972), held that courts, in evaluating the proportionality of sentences under the "cruel or unusual punishment" clause, are

required to consider (1) the severity of the sentence relative to the gravity of the offense, (2) sentences imposed in the same jurisdiction for other offenses, (3) sentences imposed in other jurisdictions for the same offense, and (4) the goal of rehabilitation, which is a criterion specifically rooted in Michigan's legal traditions. Determining whether the Legislature's chosen sentence runs afoul of the Michigan Constitution's protections is well within the purview of this Court. Under this test, mandatorily subjecting 18-year-old defendants to life in prison, without first considering the attributes of youth, is unusually excessive imprisonment; thus, automatic life without parole for this class of defendants is a disproportionate sentence that constitutes "cruel or unusual punishment" under Const 1963, art 1, § 16. The first factor weighed in favor of finding that the penalty was cruel or unusual. While defendant's crime was serious, the sentence was the most severe sentence available in Michigan, and young persons will inevitably serve more time and spend a greater percentage of their lives behind prison walls than similarly situated older adult offenders. Moreover, because of the dynamic neurological changes that late adolescents undergo as their brains develop over time and essentially rewire themselves, automatic condemnation to die in prison at 18 was cruel. The logic articulated in *Miller* about why children are different from adults for purposes of sentencing applied in equal force to 18-year-olds. Michigan's sentencing scheme has failed to consider whether any 18-year-old defendants are irreparably corrupt, whether they have the capacity to positively reform as they age, and whether they committed their crime at a time in their life when they lacked the capability to fully understand the consequences of their actions. This was completely contrary to *Bullock*, which held that for a punishment to be constitutionally proportionate, it must be tailored to a defendant's personal responsibility and moral guilt. The second factor also weighed in favor of finding the penalty cruel or unusual. Because 18-year-old offenders will inevitably spend more time behind prison bars than any other adult offenders convicted of the same crime or similarly severe crimes, this penalty was disproportionate to other offenders in Michigan. Moreover 18-year-old offenders will spend more time in prison than most equally culpable juvenile offenders, who are eligible for term-of-years sentences with the possibility of parole at some point in their adult lives under *Miller* and MCL 769.25. The third factor was more neutral than the first two, although it weighed slightly in favor of an individualized sentencing procedure for 18-year-old offenders. Excluding Michigan, 17 states and the federal government mandate life without parole for equivalent first-degree murder. However, 25 states and the District of Columbia do not legislatively mandate life without parole for equivalent first-degree murder, regardless of the age of the offender. The state of Washington, with a similarly broad punishment provision in its constitution, judicially found the neurological differences between juveniles and 18-year-olds to be nonexistent and mandated that young adults through the age of 20 receive the same individualized sentencing protections as juveniles. Likewise, six more states only mandate life without parole for equivalent first-degree murder when there are proven aggravated circumstances. Michigan was thus among the minority of states that legislatively mandate life without parole for every perpetrator of first-degree murder above the age of 17. Finally, the fourth factor, the goal of rehabilitation, which is a specific goal of Michigan's criminal-punishment system, was not accomplished by mandatorily sentencing an individual to life in prison without any hope of release. Accordingly, under the proportionality test, Michigan's sentencing scheme mandating that 18-year-old defendants convicted of first-degree murder receive a sentence of life imprisonment without the possibility of parole constituted cruel or unusual punishment under Const 1963, art 1, § 16.

3. Parks had to be resentenced given that he was automatically sentenced to spend the rest of his life in prison under MCL 750.316. The sentencing court in this case gave no consideration

to any of the attributes of youth that Parks shared with juvenile defendants. The attributes of youth must be considered to ensure that the sentencing of 18-year-old defendants found guilty of first-degree murder passes constitutional muster. Nor was he given the same benefit of an individualized sentencing procedure that exists pursuant to either MCL 769.25a or MCL 769.25 as afforded to juveniles neurologically identical to him.

4. The prosecution's request to revisit *Lorentzen* and *Bullock* was declined because there was no basis for overturning the well-established precedent that the Michigan Constitution provides broader protection to criminal defendants from disproportionate punishments than that offered under the federal Constitution. There is an unambiguous, meaningful textual difference between the federal constitutional provision and Michigan's constitutional provision. The original meaning of a constitutional provision is not easily definable and should not be used to overturn 50 years of precedent.

Part II(B)(4) of the Court of Appeals opinion was reversed, Parks's sentence for first-degree murder was vacated, and the case was remanded to the Genesee Circuit Court for Parks to be resentenced under MCL 769.25. Leave to appeal was denied in all other respects. On remand, the Genesee Circuit Court was directed to redetermine a portion of Parks's restitution order pursuant to the decision of the Court of Appeals.

Justice BERNSTEIN, concurring, agreed with the majority's analysis of the proportionality test outlined in *People v Bullock*, 440 Mich 15 (1992), and with the majority's conclusion that the imposition of mandatory sentences of life imprisonment without the possibility of parole on 18-year-old offenders violates this proportionality principle, but he wrote separately to highlight additional reasons that support this position. The majority's decision shifted more control over difficult sentencing decisions to local actors, which Justice BERNSTEIN believed would only help when making difficult choices on an individualized basis. Additionally, evolving standards of decency have changed enough to both redefine what type of punishment is viewed as cruel and unusual and the breadth of the class afforded protection from such punishment; accordingly, Justice BERNSTEIN believed that it was problematic to draw a bright line under which age is the only criterion in determining whether a mandatory sentence of life without the possibility of parole is cruel or unusual. He believed that a better approach would be to institute a shifting age-based presumption through which offenders could move to seek additional process based on other, non-age-based qualities of diminished culpability, which could entitle some offenders over the age of 18 to the same protections as youthful offenders.

Justice ZAHRA, joined by Justice VIVIANO, dissenting, joined Justice CLEMENT's dissenting opinion in full and would accept the prosecution's invitation to revisit caselaw interpreting Const 1963, art 1, § 16—specifically whether Article 1, § 16 provides greater protection than the Eighth Amendment of the United States Constitution and whether Article 1, § 16 contains a proportionality guarantee.

Justice CLEMENT, joined by Justices ZAHRA and VIVIANO, dissenting, would not have extended *Miller*'s rule to offenders who were 18 years old at the commission of their crime because imposing mandatory sentences of life without parole on 18-year-old offenders is not unconstitutional under either the Eighth Amendment of the United States Constitution or Const 1963, art 1, § 16. When applying the proportionality test, the first factor, the gravity of the offense

as opposed to the severity of the punishment, weighed in favor of finding the penalty constitutional. First-degree murder is a very serious offense, arguably the most serious offense one can commit; accordingly, a very severe sentence is proportionate. Moreover, even given young adults' ongoing neurological development, 18-year-olds are generally more than able to comprehend the gravity of the offense of first-degree murder. The second factor, the penalty imposed for the offense compared to penalties imposed on other offenders in Michigan, also weighed in favor of finding the penalty constitutional because mandatory life without parole for first-degree murder is not out of place when considered alongside other punishments that also require the imposition of a mandatory sentence of life without parole, including first-degree criminal sexual conduct, adulteration of drugs with intent to kill, and possession with intent to unlawfully use an explosive device causing death, among other offenses. The third factor, the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, weighed in favor of finding the penalty constitutional. Seventeen other states and the federal government also have mandatory sentences of life without parole for 18-year-old offenders, and the existence of one opinion by a sister state's supreme court did not shed much light on whether the third factor weighed in favor of the penalty's unconstitutionality. Finally, although the fourth factor, whether the penalty imposed advances the penological goal of rehabilitation, does not weigh in favor of the penalty's constitutionality given that a defendant sentenced to mandatory life without parole has little realistic chance for parole, there are other valid penological goals, such as retribution, deterrence, and incapacitation. Accordingly, the first three factors weighed strongly in favor of the punishment's constitutionality, and to the extent that the fourth factor weighed against the punishment's constitutionality, this factor alone was insufficient to support a determination that mandatory sentences of life without parole are unconstitutional. Furthermore, the majority's reliance on neuroscience demonstrated that its decision was based in large part on policy, and policy decisions should be left to the Legislature.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 28, 2022

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                                    No. 162086

KEMO KNICOMBI PARKS,

        Defendant-Appellant.

BEFORE THE ENTIRE BENCH

WELCH, J.

This is the direct appeal of the mandatory life-without-parole sentence imposed on defendant, Kemo Knicombi Parks, for his first-degree premeditated-murder conviction under MCL 750.316(1)(a). Parks was 18 years old when he aided and abetted in the murder. Parks asserts that his sentence is cruel and/or unusual punishment under both the United States and Michigan Constitutions. Under current United States Supreme Court precedent, Parks's Eighth Amendment argument must fail. However, we hold that his

sentence of mandatory life without parole violates the Michigan Constitution's ban on "cruel or unusual" punishment. Const 1963, art 1, § 16. Specifically, his sentence lacks proportionality because it fails to take into account the mitigating characteristics of youth, specifically late-adolescent brain development. Therefore, we reverse the portion of the judgment of the Court of Appeals affirming Parks's sentence, vacate Parks's life-without-parole sentence, and remand this case to the Genesee Circuit Court for resentencing proceedings that are consistent with this opinion.

## I. BACKGROUND

### A. FACTUAL AND PROCEDURAL HISTORY

On October 5, 2016, Parks's older cousin, Dequavion Harris, shot and killed the victim in the parking lot of a convenience store. According to a witness, prior to the murder, Parks and Harris spoke to each other in low voices and whispers in the back seat of a car parked outside the convenience store. Parks then gave a gun to Harris. Both men entered the store, and Harris exited to the parking lot a short time later. Parks remained inside the store. Thereafter, the victim, who was sitting in his car in the parking lot, was shot and killed. Witnesses heard gunshots and observed Harris flee the parking lot. Parks was 18 years old at the time of the shooting.

At trial, the prosecution's theory was that Harris and Parks planned to kill the victim in retaliation for the prior murder of Harris's cousin. The prosecution never alleged that Parks shot the victim; instead, the prosecution charged Parks with first-degree premeditated murder under an aiding-and-abetting theory. Both Harris and Parks were found guilty of first-degree premeditated murder, MCL 750.316(1)(a); carrying a concealed pistol, MCL 750.227(2); and possession of a firearm during the commission of a felony (felony-

2

firearm), MCL 750.227b.  Both defendants were sentenced to mandatory life without parole for their first-degree-murder convictions, to be served consecutively with the mandatory two-year minimum for felony-firearm.

With the aid of counsel, both defendants appealed in the Court of Appeals, and the Court of Appeals consolidated the cases.[1]  In an unpublished per curiam opinion, the Court of Appeals affirmed Harris's and Parks's convictions and sentences, with the exception of ordering a limited remand in Parks's appeal to redetermine a portion of Parks's restitution order.  *People v Harris*, unpublished per curiam opinion of the Court of Appeals, issued August 13, 2020 (Docket Nos. 346586 and 346587), p 14.  The Court of Appeals specifically rejected Parks's challenge to his sentence as cruel and unusual punishment under the federal and state Constitutions.  *Id*. at 11-12.

Parks sought leave to appeal in this Court, and we ordered additional briefing to address

> whether the United States Supreme Court's decisions in *Miller v Alabama*, 567 US 460 (2012), and *Montgomery v Louisiana*, 577 US 190 (2016), should be applied to defendants who are over 17 years old at the time they commit a crime and who are convicted of murder and sentenced to mandatory life without parole, under the Eighth Amendment to the United States Constitution or Const 1963, art 1, § 16, or both.[2]

---

[1] *People v Harris*, unpublished order of the Court of Appeals, entered March 31, 2020 (Docket Nos. 346586 and 346587).  Parks moved to remand the case to the trial court for an evidentiary hearing regarding the issues he raised on appeal, and the Court of Appeals denied the motion.  *People v Parks*, unpublished order of the Court of Appeals, entered August 30, 2019 (Docket No. 346587).

[2] *People v Parks*, 508 Mich 940, 940 (2021).  We also scheduled oral argument in *People v Poole* (Docket No. 161529) at the same session.  *Id*.  We have remanded *Poole* to the

## B. THE EIGHTH AMENDMENT DICTATES THAT YOUTH MATTERS IN SENTENCING

The Eighth Amendment of the United States Constitution reads in full: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" US Const, Am VIII (emphasis added). "[T]he Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions. The right flows from the basic precept of justice that punishment for crime should be graduated and proportioned to the offense." *Roper v Simmons*, 543 US 551, 560; 125 S Ct 1183; 161 L Ed 2d 1 (2005) (quotation marks, citation, and brackets omitted). To that end, the United States Supreme Court has stated that to determine if a punishment is disproportionate, courts must look to the "evolving standards of decency that mark the progress of a maturing society . . . ." *Id*. at 561 (quotation marks and citation omitted). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Id*. at 560. "The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances." *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

The Supreme Court has long recognized that children are constitutionally different from adults for sentencing purposes. See *Miller v Alabama*, 567 US 460, 471; 132 S Ct 2455; 183 L Ed 2d 407 (2012). Overall, juveniles have diminished culpability and greater prospects for reform, thereby making them "less deserving of the most severe punishments." *Id*. (quotation marks and citation omitted). "Youth is more than a

---

Court of Appeals for consideration of defendant Poole's case in light of this opinion. *People v Poole*, ___ Mich ___ (2022) (Docket No. 161529).

4

chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Roper*, 543 US at 569 (quotation marks, citation, and brackets omitted).

The United States Supreme Court has succinctly summarized the three significant differences between juveniles and adults. "First, children have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking." *Miller*, 567 US at 471 (quotation marks and citation omitted). "Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings." *Id*. (citation omitted). "And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " *Id*. (citation omitted). "Deciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible'—but 'incorrigibility is inconsistent with youth.' " *Id*. at 472-473 (quotation marks and citation omitted). This basic overall principle—that youthful characteristics render defendants less culpable—has shaped Eighth Amendment jurisprudence for the last two decades.

In 2005, the United States Supreme Court first recognized that children are different from adults for sentencing purposes when it abolished the death penalty for minors in *Roper*, 543 US at 578-579. In doing so, it determined that the differences between juvenile and adult defendants "are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." *Id*. at 572-573. As the death penalty is reserved for only the worst offenders, this group could not include

5

juveniles.[3] See *id*. at 569. In making this bright-line prohibition of the death penalty for those under 18 years old, the Court explained why it drew the line at 18:

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. *The qualities that distinguish juveniles from adults do not disappear when an individual turns 18.* By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest. [*Id*. at 574 (emphasis added).]

Five years later, in *Graham*, 560 US at 74, the Court concluded that "penological theory is not adequate to justify life without parole for juvenile nonhomicide offenders," and thus the penalty was deemed cruel and unusual under the Eighth Amendment. "This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment." *Id*. Thus, defendants in this situation should be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 75. Notably, in its holding the Court cited *Roper*'s reasoning about why it drew the line

---

[3] As further support for its holding in *Roper*, the Court also noted:

> Our determination that the death penalty is disproportionate punishment for offenders under 18 finds confirmation in the stark reality that the United States is the only country in the world that continues to give official sanction to the juvenile death penalty. This reality does not become controlling, for the task of interpreting the Eighth Amendment remains our responsibility. Yet . . . the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of cruel and unusual punishments. [*Roper*, 543 US at 575 (quotation marks and citation omitted).]

between adulthood and childhood at age 18, concluding that the same line applied to the categorical ban of life-without-parole sentences for nonhomicide offenses. *Id*. at 74-75.[4]

In *Miller*, 567 US at 477, the United States Supreme Court held that mandatory life without parole for a juvenile convicted of a homicide offense was unconstitutional because it "precludes consideration of [the juvenile's] chronological age and its hallmark features— among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller* therefore established a constitutional rule that requires that sentencing courts consider the unique characteristics of youth. To do so, the Court established factors that a sentencing court must consider, and these factors have become known as the "*Miller* factors." These include: (1) chronological age and immaturity, impetuosity, and the failure to appreciate risks and consequences; (2) the offender's family and home environment; (3) circumstances of the offense, including the extent of participation in the criminal conduct and the effect of familial and peer pressures; (4) the effect of the offender's youth on the criminal-justice process, such as the offender's inability to comprehend a plea bargain; and (5) the possibility of rehabilitation. *Id*. at 477-478. These "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id*. at 472. The Court concluded:

> We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. Cf. *Graham*, 560 U.S., at 75, 130 S.Ct., at 2030 ("A State is not required to guarantee eventual freedom," but must provide "some

---

[4] Again, like in *Roper*, as justification for its holding, the Supreme Court noted that at the time only 11 nations authorized life without parole for juvenile offenders under any circumstances and that the United States was one of only two nations that ever imposed the punishment in practice. *Graham*, 560 US at 80-81.

meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"). By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. . . . But given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. *That is especially so because of the great difficulty we noted in* Roper *and* Graham *of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."* *Roper*, 543 U.S., at 573, 125 S.Ct. 1183; *Graham*, 560 U.S., at 68, 130 S.Ct., at 2026-2027. Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison. [*Miller*, 567 US at 479-480 (emphasis added).]

Following *Miller*, the United States Supreme Court was presented with the question whether *Miller*'s ban on mandatory sentencing schemes applies retroactively. *Montgomery v Louisiana*, 577 US 190, 193-194; 136 S Ct 718; 193 L Ed 2d 599 (2016). In *Montgomery*, the Court clarified:

Because *Miller* determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption, it rendered life without parole an unconstitutional penalty for a class of defendants because of their status—that is, juvenile *offenders whose crimes reflect the transient immaturity of youth*. As a result, *Miller* announced a substantive rule of constitutional law. Like other substantive rules, *Miller* is retroactive because it necessarily carries a significant risk that a defendant—here, the vast majority of juvenile offenders—faces a punishment that the law cannot impose upon him. [*Montgomery*, 577 US at 208-209 (quotation marks, citations, and brackets omitted; emphasis added).]

The Court reiterated that "[a]lthough *Miller* did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect

8

' "irreparable corruption." ' " *Id*. at 195, quoting *Miller*, 567 US at 479, in turn quoting *Roper*, 543 US at 573. Ultimately, *Montgomery* clarified that *Miller* "required that sentencing courts consider a child's diminished culpability and heightened capacity for change before condemning him or her to die in prison." *Montgomery*, 577 US at 195 (quotation marks and citation omitted).

Most recently, in *Jones v Mississippi*, 593 US ___, ___; 141 S Ct 1307, 1317; 209 L Ed 2d 390 (2021), the Supreme Court held that "*Miller* required a discretionary sentencing procedure." The Court explained: "The key assumption of both *Miller* and *Montgomery* was that discretionary sentencing allows the sentencer to consider the defendant's youth, and thereby helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age." *Id*. at ___; 141 S Ct at 1318.

Post-*Miller*, and in anticipation of *Montgomery*, Michigan's Legislature established juvenile resentencing procedures that are consistent with these cases. MCL 769.25a; MCL 769.25. The statutes require the court to sentence a defendant to at least a 60-year maximum term and a minimum term of not less than 25 years or more than 40 years, unless the prosecuting attorney files a motion seeking a sentence of life without parole. MCL 769.25a(4)(b) and (c); MCL 769.25(3) and (9). If the prosecutor seeks a sentence of life without parole, the trial court must conduct a hearing and consider the *Miller* factors, any other relevant criteria, and the defendant's record while incarcerated. MCL 769.25a(4)(b); MCL 769.25(6). In *People v Taylor*, ___ Mich ___; ___ NW2d ___ (2022) (Docket No. 154994), we held that the combination of *Miller* and MCL 769.25 creates a rebuttable presumption against life-without-parole sentences for juvenile offenders and that the

9

prosecution, as the moving party, must overcome this presumption by clear and convincing evidence.

## C. THE MICHIGAN CONSTITUTION FORBIDS EXCESSIVE IMPRISONMENT

Michigan's Constitution has its own punishment provision, but it is broader than the federal Eighth Amendment counterpart. The provision reads in full: "Excessive bail shall not be required; excessive fines shall not be imposed; *cruel or unusual punishment* shall not be inflicted; nor shall witnesses be unreasonably detained." Const 1963, art 1, § 16 (emphasis added). We have held that unusually excessive imprisonment is forbidden by Article 1, § 16 of the Michigan Constitution. *People v Lorentzen*, 387 Mich 167, 170 n 1, 172; 194 NW2d 827 (1972) (invalidating a mandatory minimum prison sentence of 20 years for selling any amount of marijuana). We further stated that this standard is informed by "evolving standards of decency that mark the progress of a maturing society." *Id*. at 179 (quotation marks and citation omitted). The definition of this standard is "progressive and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Id*. at 178 (quotation marks and citation omitted).

Further, we have held that our Constitution requires that sentencing decisions be proportional. Our seminal opinion on the principle of proportionality is *People v Bullock*, 440 Mich 15; 485 NW2d 866 (1992). In that case, we held that a life-without-parole sentence for possession of 650 grams or more of a mixture containing cocaine was unconstitutional under the state Constitution because of a lack of proportionality. *Id*. at 27, 30. We set forth three compelling reasons that the state Constitution's ban on "cruel or unusual" punishment offers broader protection than its federal counterpart. *Id*. at 30. First,

10

there are textual differences between the state and federal Constitutions; a bar on punishments that are either cruel *or* unusual is necessarily broader than a bar on punishments that are both cruel *and* unusual. *Id*. at 30 n 11. Second, by 1963, the words "cruel" and "unusual" had been understood "for more than half a century to include a prohibition on grossly disproportionate sentences," indicating that the framers and adopters of the 1963 Constitution had intended a broader view of the state constitutional protection. *Id*. at 32. Lastly, we recognized that there is longstanding Michigan precedent to support this broader view of Michigan's constitutional provision. *Id*. at 33.

In particular, we noted that Michigan courts, in evaluating the proportionality of sentences under the "cruel or unusual punishment" clause, are required to consider: (1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation, which is a criterion specifically "rooted in Michigan's legal traditions . . . ." *Id*. at 33-34, citing *Lorentzen*, 387 Mich at 176-181. The Court in *Bullock* concluded that the *Lorentzen* analysis was "firmly and sufficiently rooted in Const 1963, art 1, § 16." *Id*. at 34. We thus held that the punishment at issue in *Bullock* was unconstitutional because it failed the *Lorentzen* balancing test, then added:

> The proportionality principle inherent in Const 1963, art 1, § 16, is not a simple, "bright-line" test, and *the application of that test may, concededly, be analytically difficult and politically unpopular, especially where application of that principle requires us to override a democratically expressed judgment of the Legislature.* The fact is, however, the people of Michigan, speaking through their constitution, have forbidden the imposition of cruel or unusual punishments, and we are duty-bound to devise a principled test by which to enforce that prohibition, and to apply that test to the cases that are brought before us. The very purpose of a constitution is to subject the passing judgments of temporary legislative or political majorities

to the deeper, more profound judgment of the people reflected in the constitution, the enforcement of which is entrusted to our judgment. [*Id*. at 40-41 (emphasis added).]

Therefore, in addition to those protections guaranteed to every citizen of this country under the Eighth Amendment of the federal Constitution, our state Constitution has historically afforded greater bulwarks against barbaric and inhumane punishments. It is through this heightened protective standard that we must consider the issue before us today.[5]

## II. ANALYSIS

After reviewing the arguments of the parties as well as the amici, we are left with the inescapable conclusion that mandatorily condemning 18-year-olds to die in prison,

---

[5] We decline the prosecution's request to revisit *Lorentzen* and *Bullock*, because we see no basis for overturning the well-established precedent that our Constitution provides broader protection to criminal defendants from disproportionate punishments than that offered under the federal Constitution. See *People v Feezel*, 486 Mich 184, 212; 783 NW2d 67 (2010) ("Indeed, this Court should respect precedent and not overrule or modify it unless there is substantial justification for doing so."). Moreover, Chief Justice Roberts's dissent in *Miller* indicates that the words "cruel and unusual" are meant to be read together in Eighth Amendment jurisprudence; thus, it remains logical to us that the Michigan Constitution's choice of the word "or" deliberately and meaningfully provides broader protection to criminal defendants. See *Miller*, 567 US at 493 (Roberts, C.J., dissenting) ("Today, the Court invokes that Amendment to ban a punishment that the Court does not itself characterize as unusual, and that could not plausibly be described as such."). Additionally, the original meaning of a constitutional provision is not easily definable and should not be used to overturn 50 years of precedent. See *People v Stovall*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 162425) (MCCORMACK, C.J., concurring); slip op at 9. This is particularly true when there is an unambiguous, meaningful textual difference between the federal constitutional provision and our own. See *People v Collins*, 438 Mich 8, 32; 475 NW2d 684 (1991) (explaining that a compelling reason for "independent state construction" of a constitutional provision "might be found if there were significant textual differences between parallel provisions of the state and federal constitutions" in addition to if history provides a reason to believe a different interpretation is warranted). Given this long-established understanding that our Constitution offers broader protection than the federal Constitution, we decline the invitation to revisit the precedent that supports this broader interpretation.

12

without consideration of the attributes of youth that 18-year-olds and juveniles share, no longer comports with the "evolving standards of decency that mark the progress of a maturing society." *Lorentzen*, 387 Mich at 179 (quotation marks and citation omitted). Therefore, we conclude that the Michigan Constitution requires that 18-year-olds convicted of first-degree murder receive the same individualized sentencing procedure under MCL 769.25 as juveniles who have committed first-degree murder, instead of being subjected to a mandatory life-without-parole sentence like other older adults.

We acknowledge that some of the mitigating characteristics in the scientific research submitted by amici and defense counsel apply to young adults, in some form, up to the age of 25. We also do not dispute the dissent's point that any line-drawing will, at times, lead to arbitrary results. The United States Supreme Court grappled with this same issue in *Roper*, 543 US at 574, noting, "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules." While line-drawing is difficult, our Constitution compels us to make these difficult decisions. Given that Parks and Poole (the defendant in the companion case) were both 18 at the time they committed their crimes, our opinion only applies to 18-year-olds. We need not address the Michigan constitutional requirements for sentencing offenders who were over 18 years old at the time of the offense.

## A. STANDARD OF REVIEW

We review questions of constitutional law de novo. *People v Kennedy*, 502 Mich 206, 213; 917 NW2d 355 (2018). Moreover, we alone are "the ultimate authority with regard to the meaning and application of Michigan law." *Bullock*, 440 Mich at 27.

13

## B. THE FEDERAL COURTS HAVE DRAWN A CLEAR LINE BETWEEN JUVENILES AND ADULTS FOR SENTENCING PURPOSES UNDER THE EIGHTH AMENDMENT

The parties in this case were asked to address whether the United States and/or Michigan Constitutions protect 18-year-olds from receiving a mandatory sentence of life without parole. Under current federal precedent, the Eighth Amendment of the United States Constitution does not prohibit such sentences.

The United States Supreme Court has, for the better part of this century, reshaped how juveniles convicted of first-degree murder must be sentenced in this country. Undoubtedly, condemning children to die in the custody of the state, either through execution or behind prison walls, without any specialized consideration of their brain's neuroplasticity and the attendant characteristic of their capacity for rehabilitation, has been deemed barbaric under the proportionality principle of the Eighth Amendment. For those who commit the most heinous of crimes, the Supreme Court has indicated a clear, even if arguably arbitrary, demarcation between adult sentencing and juvenile sentencing. While this holding relies on the brain science that applies equally to juveniles and early adolescents—which includes 18-year-olds—we cannot contradict the Supreme Court if it has drawn a clear and unambiguous line under the United States Constitution between those under the age of 18 and those aged 18 and older.

The Court has indeed drawn that line. In 2005, the Court noted in *Roper* that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18" but that it must draw the line where society has traditionally marked the transition from childhood to adulthood. *Roper*, 543 US at 574. Likewise, *Graham* drew a bright line at 18 when categorically prohibiting juvenile life without parole for nonhomicide offenses,

14

citing the same logic from *Roper*. *Graham*, 560 US at 74-75. The subsequent decisions of *Miller*, *Montgomery*, and *Jones* did not question or reform the bright line drawn in *Roper*.[6]

Therefore, in light of current federal precedent, we find no support in the Eighth Amendment for extending *Miller*'s protections under the Eighth Amendment beyond the bright line originally set in *Roper*. But the fact that the United States Supreme Court has decided to draw the line at 17 does not preclude us from drawing a different line pursuant to the broader protections provided by the Michigan Constitution. It is only logical that Michigan's "cruel *or* unusual" language is broader than the Eighth Amendment floor. And the Supreme Court, in fact, recently indicated that states have a wide latitude in providing greater *Miller* protections. See *Jones*, 593 US at ___; 141 S Ct at 1323 ("Importantly, like *Miller* and *Montgomery*, our holding today does not preclude the States from imposing additional sentencing limits . . . . States may also establish rigorous proportionality or other substantive appellate review of life-without-parole sentences.").

In other words, we may draw our own line, and we do so today.

---

[6] Additionally, multiple federal circuit courts of appeal have declined challenges similar to those raised by Parks. See, e.g., *United States v Sierra*, 933 F3d 95, 97 (CA 2, 2019) ("Since the Supreme Court has chosen to draw the constitutional line at the age of 18 for mandatory minimum life sentences, . . . the defendants' age-based Eighth Amendment challenges to their sentences must fail."), cert denied sub nom *Beltran v United States*, ___ US ___; 140 S Ct 2540 (2020); *Wright v United States*, 902 F3d 868, 872 (CA 8, 2018) ("[The defendant] was sentenced for conspiratorial conduct that extended well into his adult years . . . . Thus, the procedural element of the new substantive rule of constitutional law made retroactive in *Montgomery* does not apply . . . .").

## C. THE 18-YEAR-OLD BRAIN

Although we are not bound by the United States Supreme Court's interpretation of the Eighth Amendment when interpreting our constitutional prohibition on cruel or unusual punishment, we find *Miller* and *Montgomery* persuasive to the extent they held that juveniles are constitutionally different from adults for purposes of imposing a life-without-parole sentence and, for the reasons stated in this opinion, adopt that general proposition under the Michigan Constitution. However, we part ways with the United States Supreme Court's jurisprudence to the extent the Court drew the line for defining the class of defendants that are entitled to individualized sentencing to those under the age of 18.

In order to determine where to draw that new line, we must consider the scientific and social-science research regarding the characteristics of the late-adolescent 18-year-old brain. By doing so, we take our cue from the United States Supreme Court, which has consistently noted the scientific justifications for its holdings regarding juvenile punishments. See, e.g., *Roper*, 543 US at 569-574; *Graham*, 560 US at 67-69; *Miller*, 567 US at 471-479. The dissent casts no criticism on the United States Supreme Court's decision to draw its bright line in *Miller* based on the neurological characteristics of juveniles as a class. *Miller*, 567 US at 471-479. Our consideration of brain science to determine whether the Legislature's chosen sentence—mandatory life without parole—is cruel or unusual to impose on 18-year-olds who commit first-degree-murder is no different than the analysis the United States Supreme Court undertook a decade ago in *Miller*.

Such judicial determinations and considerations are not an exercise of an inappropriate policy-making function but a requirement under our Constitution. Appellate courts, including our Court, often use science to determine evidentiary issues in criminal

16

cases.[7]  And, most importantly, in the punishment context, science has always informed what constitutes "cruel" or "unusual" punishment in regards to certain classes of defendants.  See, e.g., *Roper*, 543 US at 569-574 ("Once the diminished culpability of juveniles is recognized, it is evident that the penological justifications for the death penalty apply to them with lesser force than to adults."); *Atkins v Virginia*, 536 US 304, 317-321; 122 S Ct 2242; 153 L Ed 2d 335 (2002) (analyzing the neurological characteristics of intellectually disabled defendants in determining that they have lessened criminal culpability; therefore, the deterrent and retributive purpose of the death penalty was not achieved and execution was not a "suitable punishment" for this class of defendants).  In short, while the dissent claims that we have embarked upon an inappropriate judicial "foray into neuroscience" or that we are "playing amateur scientists," it is our role to consider objective, undisputed scientific evidence when determining whether a punishment is unconstitutional as to a certain class of defendants.  Our role is no different than that of the United States Supreme Court and its own historical approach to Eighth Amendment jurisprudence.[8]

Based on the submissions from defense counsel and the neuropsychologist, psychologist, and criminal-justice scholar amici, there is a clear consensus that late adolescence—which includes the age of 18—is a key stage of development characterized

---

[7] See *People v Feezel*, 486 Mich 184, 207-212; 783 NW2d 67 (2010) (holding that 11-carboxy-THC is not a controlled substance, in part, because it is a metabolite that is created when a person's body breaks down THC).

[8] Moreover, our decision today is not solely based on science but on other factors relevant to the proportionality test.

by significant brain, behavioral, and psychological change. This period of late adolescence is a pivotal developmental stage that shares key hallmarks of adolescence. This consensus arises out of a multitude of reliable studies on adolescent brain and behavioral development in the years following *Roper*, *Graham*, *Miller*, and *Montgomery*. And the inherent malleability and plasticity of late-adolescent brains are features that are similar to those that the *Miller* Court found relevant to its culpability analysis, which, in turn, formed the basis of *Miller*'s prohibition on mandatory life-without-parole sentences for adolescent defendants.

The key characteristic of the adolescent brain is exceptional neuroplasticity. See Aoki, Romeo, & Smith, *Adolescence as a Critical Period for Developmental Plasticity*, 1654 Brain Res 85 (2017). Because of multiple ongoing processes that relate to development of the brain, during which the brain essentially rewires itself, young adolescents undergo a period during which they are still developing cognitively. See, e.g., Selemon, *A Role for Synaptic Plasticity in the Adolescent Development of Executive Function*, 3 Translational Psychiatry 1 (2013); Spear, *Adolescent Neurodevelopment*, 52 J Adolescent Health 7 (2013). This crucial period of cognitive development has significant consequences for young adults' behavior.

First, the research indicates that late adolescents are hampered in their ability to make decisions, exercise self-control, appreciate risks or consequences, feel fear, and plan ahead. See National Academies of Sciences, Engineering, and Medicine, *The Promise of Adolescence: Realizing Opportunity for All Youth* (Washington, DC: The National Academies Press, 2019), pp 37, 51-52. Thus, this period of late adolescence is characterized by impulsivity, recklessness, and risk-taking, as evidenced by the heightened

18

incidents of drunk driving, unintended pregnancies, binge drinking, and arrests during this period. See Willoughby et al, *Examining the Link Between Adolescent Brain Development and Risk Taking from a Social-Developmental Perspective*, 83 Brain & Cognition 315, 315-320 (2013). This process of brain rewiring means that young adults have yet to reach full social and emotional maturity, given that the prefrontal cortex—the last region of the brain to develop, and the region responsible for risk-weighing and understanding consequences—is not fully developed until age 25. See, e.g., *The Promise of Adolescence: Realizing Opportunity for All Youth*, p 51; Arain et al, *Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449, 449-450, 453-454 (2013).

Secondly, this period of development also explains why a young adult is more susceptible to negative outside influences, including peer pressure. See Gardner & Steinberg, *Peer Influence on Risk Taking, Risk Preference, and Risky Decision Making in Adolescence and Adulthood: An Experimental Study*, 41 Dev Psychol 625, 629-634 (2005). This susceptibility to peer pressure exacerbates late adolescents' predisposition to risk-taking and deficiencies in decision-making. See *id*. In the presence of peers, young adults are more sensitive to the potential rewards as opposed to the potential consequences or costs of a decision. See O'Brien et al, *Adolescents Prefer More Immediate Rewards When in the Presence of their Peers*, 21 J Res on Adolescence 747, 747-753 (2011). This results in a late adolescent often behaving more similarly to a 14- or 15-year-old, as opposed to an older adult, when in the presence of their peers. See *id*. Furthermore, 18-year-olds are acutely sensitive to the potential of social rejection, which increases conformity with their peers. See Blakemore, *The Social Brain in Adolescence*, 9 Nature Reviews Neuroscience 267, 269 (2008).

Lastly, these hallmarks of the developing brain render late adolescents less fixed in their characteristics and more susceptible to change as they age. Late adolescents, as they age, continue to formulate their identities, become more assertive and decisive, show increases in self-control and the ability to resist outside influence, become more reflective and deliberate, and demonstrate a decrease in aggressiveness and alienation. See, e.g., *Adolescence as a Critical Period for Developmental Plasticity*, 1654 Brain Res at 85; Tanner & Arnett, *The Emergence of "Emerging Adulthood": The New Life Stage Between Adolescence and Young Adulthood*, in *Handbook of Youth and Young Adulthood: New Perspectives and Agendas* (New York: Routledge, 2009), pp 39-42.

Overall, late-adolescent brains are far more similar to juvenile brains, as described in *Miller*, 567 US at 471-479, than to the brains of fully matured adults. Notably, the prosecution does not even attempt to refute the scientific consensus that, in terms of neurological development, there is no meaningful distinction between those who are 17 years old and those who are 18 years old. The ongoing neurodevelopment described in scientific and medical literature, characterized by neuroplasticity and its attendant characteristics, blurs the already thin societal line between childhood and young adulthood.

This evolving understanding of a juvenile's neurological and psychological development is reflected generally in Michigan statutory provisions governing young adults. In Michigan, when an individual attains the age of 18, their ability to partake in certain activities is still heavily regulated. Despite obtaining access to some rights and privileges, 18-year-olds still may not purchase, consume, or possess alcohol, MCL 436.1109(6) and MCL 436.1703(1); purchase or possess cannabis for adult use under state law, MCL 333.27954(1) and MCL 333.27955; open a credit card without a cosigner, 15

20

USC 1637(c)(8); or obtain a concealed-carry permit for a pistol, MCL 28.425b(7)(a). Additionally, Michigan has long recognized the differences in late-adolescent brain development, as evidenced by the Holmes Youthful Trainee Act (HYTA), MCL 762.11 *et seq*. HYTA was passed in 1966 and originally covered youths between the ages of 17 and 24, allowing these late adolescents to be assigned "youthful trainee" status and to be placed on probation if they plead guilty to a criminal offense. In 2021, the qualifying age for HYTA sentencing was raised to late adolescents between the ages of 18 and 26. 2020 PA 396. Both federal and state laws suggest that our society has judged 18-year-olds as not sufficiently mature to engage in certain risky and potentially dangerous activities; these laws recognize that 18-year-olds make decisions differently. They have therefore been provided different sentencing pathways than their adult counterparts. This societal recognition is highly relevant to determining whether mandatory life without parole is unconstitutional as applied to 18-year-old offenders. See *Lorentzen*, 387 Mich at 179.

The Washington Supreme Court has also recognized this evolving scientific and social consensus. In 2021, that court determined that modern social-scientific evidence regarding the development of the human brain, as well as its own precedent and "a long history of arbitrary line drawing," demonstrated no clear line between childhood and adulthood. See *In re Monschke*, 197 Wash 2d 305, 306-307; 482 P3d 276 (2021). Washington's constitution prohibits "cruel punishment." Wash Const 1889, art 1, § 14. The Washington Supreme Court has held that its constitution affords heightened protection beyond that offered by the Eighth Amendment of the United States Constitution. Accordingly, the Washington Supreme Court determined that with regard to mandatory life-without-parole sentences, *Miller*'s constitutional guarantee of an individualized

21

sentence (including its required consideration of the mitigating qualities of youth) applies to defendants over the age of 18. Notably, in analyzing the scientific evidence, the Washington Supreme Court concluded:

> [*N*]*o meaningful neurological bright line exists between age 17 and age 18* . . . . Thus, sentencing courts must have discretion to take the mitigating qualities of youth—those qualities emphasized in *Miller* . . .—into account for defendants younger and older than 18. Not every 19- and 20-year-old will exhibit these mitigating characteristics, just as not every 17-year-old will. We leave it up to sentencing courts to determine which individual defendants merit leniency for these characteristics. Our aggravated murder statute's requirement of [life without parole] for *all* defendants 18 and older, regardless of individual characteristics, violates the state constitution. [*In re Monschke*, 197 Wash 2d at 326 (first emphasis added).]

These principles are all helpful as we determine the constitutionality under Const 1963, art 1, § 16 of mandatory life-without-parole sentences for 18-year-olds convicted of first-degree murder.

## D. PROPORTIONALITY UNDER THE MICHIGAN CONSTITUTION

In order to determine whether our Constitution compels additional considerations when sentencing 18-year-old defendants convicted of first-degree murder to mandatory life without parole, we apply the *Lorentzen* test, as reaffirmed in *Bullock*. The *Lorentzen* test is used to determine whether a punishment is disproportionate and thus "cruel or unusual." We reiterate that this four-factor test requires us to consider: (1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation, which is a criterion specifically "rooted in Michigan's legal traditions . . . ." *Bullock*, 440 Mich at 33-34.

22

We hold that this test, overall, compels the conclusion that mandatorily subjecting 18-year-old defendants to life in prison, without first considering the attributes of youth, is unusually excessive imprisonment and thus a disproportionate sentence that constitutes "cruel or unusual punishment" under Const 1963, art 1, § 16. While the Legislature has authorized such sentences, we are duty-bound to enforce the state Constitution through application of the *Lorentzen* test to reflect "the deeper, more profound judgment of the people reflected in the constitution . . . ." *Bullock*, 440 Mich at 40-41. That judgment compels an individualized sentencing process before condemning 18-year-olds to die behind prison walls.[9]

While the dissent believes that the punishment rendered in this case is a statutory decision that is only within the purview of the Legislature, we note that the interpretation of Const 1963, art 1, § 16 governs our decision. We are duty-bound to interpret the Constitution, no matter the outcome. Contrary to what the dissent argues, determining whether the Legislature's chosen sentence runs afoul of our Constitution's protections is well within the purview of this Court and does not violate any separation-of-power principles. We cannot shirk our duty and defer to the Legislature's choice of punishment

---

[9] We recognize that this Court has previously held that a mandatory life-without-parole sentence for felony murder did not violate Const 1963, art 1, § 16. See *People v Hall*, 396 Mich 650, 657-658; 242 NW2d 377 (1976). However, that decision did not address the issue of sentencing a *juvenile* to life without parole. Moreover, *Hall* was decided before the United States Supreme Court decided *Miller* and its progeny, and the *Hall* Court did not have the benefit of the scientific literature cited in this opinion. Accordingly, that decision does not preclude our holding in this case. Moreover, our holding today does not foreclose future review of life-without-parole sentences for other classes of defendants; however, our opinion today does not affect *Hall*'s holding as to those older than 18. See *Hall*, 396 Mich at 657-658.

23

when its choice is offensive to our Constitution. See *Bullock*, 440 Mich at 41 ("The very purpose of a constitution is to subject the passing judgments of temporary legislative or political majorities to the deeper, more profound judgment of the people reflected in the [C]onstitution, the enforcement of which is entrusted to our judgment.").

1. THE SEVERITY OF THE SENTENCE; THE GRAVITY OF THE OFFENSE

Parks's current fate is to die in prison because of his conviction for first-degree-premeditated murder, MCL 750.316(1)(a), based on a theory of aiding and abetting his cousin, Harris. There can be no dispute that any form of murder is one of the most severe and heinous crimes that a person can commit in any jurisdiction, and first-degree murder is particularly heinous. See *People v Stovall*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 162425); slip op at 10 (quoting *People v Carp*, 496 Mich 440, 514; 852 NW2d 801 (2014), cert gtd and opinion vacated sub nom on other grounds *Carp v Michigan*, 577 US 1186 (2016), for the proposition that first-degree murder is " 'almost certainly the gravest and most serious offense that an individual can commit under the laws of Michigan' "). While Parks was not the principal actor in this particular murder, there can be no dispute that the crime of which he was convicted was grave and heinous. A long prison term was indeed warranted. However, our inquiry does not end there, because the proportionality analysis we are required to follow applies equally to those who commit severe crimes and to those who commit lesser offenses. See *Bullock*, 440 Mich at 40-41.

Just as there can be no dispute that Parks's crime was serious, there can also be no dispute that his sentence is severe. Mandatory life without parole is the *most* severe

sentence available in Michigan.[10]  Indeed, other than the death penalty, it is the most severe

sentence still available in the whole country.  As the United States Supreme Court has

noted, life without parole " 'share[s] some characteristics with death sentences' " because

unlike any other sentence, imprisonment without hope of release for the whole of a person's

natural life is " 'a forfeiture that is irrevocable.' "  *Miller*, 567 US at 474-475, quoting

*Graham*, 560 US at 69.  This fate is particularly acute for young persons like Parks, because

they will inevitably serve more time and spend a greater percentage of their lives behind

prison walls than similarly situated older adult offenders.  Contrary to the dissent's

assertion, the length of time an offender will spend in prison is undoubtedly a relevant

consideration in determining the constitutionality of mandatory life-without-parole

sentences.  See *Miller*, 567 US at 475, quoting *Graham*, 560 US at 70 (noting that life

without parole "is an 'especially harsh punishment for a juvenile,' because he will almost

inevitably serve 'more years and a greater percentage of his life in prison than an adult

offender.'  The penalty when imposed on a teenager, as compared with an older person, is

therefore 'the same in name only' ") (citation and ellipsis omitted).[11]

---

[10] Michigan was the first state in the nation to abolish the death penalty; it was abolished
a decade after the state was admitted to the Union.  The last execution to take place under
Michigan law was in 1830.  State Bar of Michigan, *Michigan Legal Milestones: 41.
First        to        Abolish        the        Death        Penalty*
<https://www.michbar.org/programs/milestone/milestones_firsttoabolish>  (accessed
June 28, 2022) [https://perma.cc/NG5K-LW6L].

[11] We also find the unpublished Court of Appeals decisions relied on by the dissent, which
rejected the argument that term-of-years sentences are equivalent to life sentences for older
defendants, are inapposite to the question we are faced with today.  Unlike those cases, our
decision today deals with a class of late-adolescent defendants who are faced with a prison
sentence to be served for the remainder of their biological lives, with no possible hope of

And, beyond the condemnation to spend nearly the entirety of one's adulthood behind bars, the unique characteristics of 18-year-old brains make this penalty even more severe. Because of the dynamic neurological changes that late adolescents undergo as their brains develop over time and essentially rewire themselves, automatic condemnation to die in prison at 18 is beyond severity—it is cruelty. The brains of 18-year-olds, just like those of their juvenile counterparts, transform as they age, allowing them to reform into persons who are more likely to be capable of making more thoughtful and rational decisions. This means that 18-year-olds, as they age, are likely to begin to take fewer risks, further understand consequences, become less susceptible to peer pressure, and have decreased aggressive tendencies. All of this suggests that 18-year-olds, much like their juvenile counterparts, are generally capable of significant change and a turn toward rational behavior that conforms to societal expectations as their cognitive abilities develop further.

Most importantly, the same features that characterize the late-adolescent brain also diminish the culpability of these youthful offenders, rendering them less culpable than older adults. Eighteen-year-olds are at the peak of their risk for criminality because of the neuroplasticity of their brains, causing a general deficiency in the ability to comprehend the full scope of their decisions as compared with older adults.[12] Put differently, the logic

---

release. For the myriad of reasons stated in this opinion, this is an entirely different inquiry than challenges brought by much older adults who are faced with term-of-years sentences.

[12] We do not dispute the dissent's general point that 18-year-olds are capable of comprehending the consequences of their actions in the abstract. However, the science informs us that adolescents also are often negatively influenced by peers and lack impulse control.

articulated in *Miller* about why children are different from adults for purposes of sentencing applies in equal force to 18-year-olds. *Miller*, 567 US at 471-479.

Despite all this, the current sentencing structure mandatorily condemns *all* 18-year-olds who are convicted of certain crimes to life in prison without considering whether they are capable of positive change and without any consideration of their lessened culpability, both of which are undeniable neurobiological facts. In other words, our current sentencing scheme fails to consider whether any 18-year-old defendants are irreparably corrupt, whether they have the capacity to positively reform as they age, and whether they committed their crime at a time in their life when they lacked the capability to fully understand the consequences of their actions. This is completely contrary to *Bullock*, which held that for a punishment to be "constitutionally proportionate" it "must be tailored to a defendant's personal responsibility and moral guilt." *Bullock*, 440 Mich at 39 (quotation marks and citation omitted). "While we emphatically do not minimize the gravity and reprehensibility of defendants' crime, it would be profoundly unfair to impute full personal responsibility and moral guilt" to those who are likely to be biologically incapable of full culpability. *Id*. Such an automatically harsh punishment without consideration of mitigating factors is unconstitutionally excessive and cruel.

## 2. SENTENCES IMPOSED IN MICHIGAN FOR OTHER OFFENSES

The second *Lorentzen* proportionality factor also weighs in favor of finding that mandatory life without parole is cruel or unusual. Life without parole is the harshest available punishment in Michigan and is seldom mandatorily imposed. It stands to reason that such a harsh sentence should be reserved for those whose criminal culpability

27

mandates automatic, permanent removal from society. Michigan's sentencing scheme generally reflects this. Nonjuvenile individuals are subject to life without parole when they commit first-degree murder, commit severely violent or highly dangerous offenses, or habitually sexually assault children. MCL 791.234(6); MCL 750.316. These crimes all reflect a high degree of moral guilt. See *Bullock*, 440 Mich at 39.

However, because life without parole is necessarily cabined to biological life, not all these sentences are, in practice, reflective of culpability equally. Having been charged and convicted for a crime committed when he was 18 years old, it is highly probable that Parks will spend more time behind prison bars than any other adult defendants convicted of the same crime or similarly severe crimes. See *Miller*, 567 US at 474-475. This is disproportionate to other offenders in this state. For example, Parks, at 18 years old, aided and abetted his cousin in committing this murder[13] and thus was mandatorily subjected to the harshest and severest penalty available in this state. If Parks lives to be 70, he will have served an approximately 52-year prison sentence. Another first-degree murderer, at age 50, who undertakes a multiple-day crime spree involving numerous robberies and murders would also mandatorily receive the harshest and severest penalty available—life without parole. However, if that hypothetical defendant lived to be the same age as Parks, he would

---

[13] We do not dispute the dissent's general point that aiders and abettors are equally liable for the same crime as the principal actor under MCL 767.39. However, a defendant's status as an aider and abettor is undoubtedly relevant in the punishment context. Indeed, the United States Supreme Court in *Miller* noted that a juvenile's status as an aider and abettor was relevant to determining relative culpability for purposes of sentencing. *Miller*, 567 US at 478 (noting that the defendant at issue "did not fire the bullet that killed" the victim but was instead convicted on an aiding-and-abetting theory, which was a circumstance considered when analyzing the defendant's "culpability for the offense").

have only served an approximately 20-year prison sentence. Considering that Parks's offense could be reflective of his diminished capacity as a late adolescent and that the hypothetical defendant's crime spree would have occurred long after his cognitive abilities had fully matured, the disproportionality is apparent. It is cruel that our current sentencing scheme requires 18-year-old defendants to, on average, serve far more severe penalties than equally or more culpable older adult defendants.

Moreover, Parks will spend more time in prison than most of his equally culpable juvenile offenders. Post-*Montgomery*, every juvenile first-degree murderer in this state has the opportunity for a specialized *Miller* sentencing hearing, at which the prosecution must demonstrate that the juvenile offender should be sentenced to life without parole and the sentencing court must agree; otherwise, the juvenile offender will receive a term-of-years sentence. MCL 769.25. Those juvenile offenders who are a matter of days younger than Parks are eligible to receive a term-of-years sentence—despite the two offenders' identical neuroplasticity—that will make the juvenile offenders eligible for parole at some point in their adult lives. It is cruel punishment to mandatorily impose a life-without-parole sentence on an 18-year-old who is one day older and has the same "immaturity, impetuosity, and failure to appreciate risks and consequences," *Miller*, 567 US at 477, as a 17-plus-364-day-old when that 17-year-old is likely to receive a less-severe sentence.[14] This arbitrary line-drawing for punishment of defendants with equal moral culpability neurologically does not pass scrutiny under the second *Lorentzen* factor.

---

[14] Additionally, we recently held "that a parolable life sentence for a defendant who commits second-degree murder while a juvenile violates Article 1, § 16 of the Michigan Constitution." *Stovall*, ___ Mich at ___; slip op at 15.

## 3. SENTENCES IMPOSED IN OTHER JURISDICTIONS FOR THE SAME OFFENSE

The third *Lorentzen* proportionality factor is more neutral than the first two, though we also conclude that it slightly weighs in favor of an individualized sentencing procedure for 18-year-old defendants in these cases. In contrast to Michigan, 25 states and the District of Columbia do not legislatively *mandate* life without parole for equivalent first-degree murder, regardless of the age of the offender.[15] Likewise, Washington, with a similarly broad punishment provision in its constitution, judicially found the neurological differences between juveniles and 18-year-olds to be nonexistent and mandated that young adults through the age of 20 also receive the same individualized sentencing protections as juveniles. See generally *In re Monschke*, 197 Wash 2d 305. Likewise, six more states only mandate life without parole for equivalent first-degree murder when there are proven aggravated circumstances.[16] This places Michigan among the minority of states that

---

[15] These jurisdictions are: Alaska, Alaska Stat 12.55.125; District of Columbia, DC Code 22-2104; Georgia, Ga Code Ann 16-5-1; Idaho, Idaho Code 18-4004; Illinois, 730 Ill Comp Stat 5/5-4.5-20(a); Indiana, Ind Code 35-50-2-3; Kentucky, Ky Rev Stat Ann 532.030; Maine, Me Stat, tit 17-A, § 1603; Maryland, Md Code Ann, Crim Law 2-201; Montana, Mont Code Ann 45-5-102(2); Nevada, Nev Rev Stat 200.030(4); New Jersey, NJ Stat Ann 2c:11-3; New Mexico, NM Stat Ann 31-18-14; New York, NY Penal Law 70.00; North Dakota, ND Cent Code 12.1-32-01; Ohio, Ohio Rev Code Ann 2929.02; Oklahoma, Okla Stat, tit 21, § 701.9; Oregon, Or Rev Stat 163.115; Rhode Island, RI Gen Laws 11-23-2; South Carolina, SC Code Ann 16-3-20; Tennessee, Tenn Code Ann 39-13-202; Utah, Utah Code Ann 76-5-203; Virginia, Va Code Ann 18.2-10 and 18.2-32; West Virginia, W Va Code 61-2-1 and 61-2-2; Wisconsin, Wis Stat 939.50; and Wyoming, Wyo Stat Ann 6-2-101.

[16] These states are: California, Cal Penal Code 190.2; Connecticut, Conn Gen Stat 53a-35a and 53a-54b; Hawai'i, Haw Rev Stat 706-656 and 706-657; Kansas, Kan Stat Ann 21-6620, 21-5401(a)(6), and 21-6617; Texas, Tex Penal Code Ann 12.31 and 12.32; and Vermont, Vt Stat Ann, tit 13, §§ 2303 and 2311.

legislatively mandate life without parole for *every* perpetrator of first-degree murder above the age of 17.

While this increased leniency in other states is persuasive to us, we would be remiss if we did not note that, excluding Michigan, 17 states[17] and the federal government[18] do still mandate life without parole for equivalent first-degree murder. Michigan is not as overwhelming of a national outlier in this case as it was in *Bullock*, 440 Mich at 40 ("[N]o other state in the nation imposes a penalty even remotely as severe as Michigan's for mere possession of 650 grams or more of cocaine."), or *Lorentzen*, 387 Mich at 179 ("Only one state, Ohio, has as severe a minimum sentence for the sale of marijuana as Michigan.").

Nonetheless, we are persuaded that our Constitution mandates that 18-year-olds be treated in the same manner as juveniles in these cases. We examine today an irrevocable sentence, offering no hope of release, for a group of defendants that are neurologically less culpable than others serving the same or, oftentimes, less-severe sentences for the same crimes. Like Washington, which has a similarly broad constitutional provision as our Const 1963, art 1, § 16, we find that our sentencing scheme does not comport with our

---

[17] The remaining states are: Alabama, Ala Code 13a-6-2(c); Arizona, Ariz Rev Stat Ann 13-1105(D); Arkansas, Ark Code Ann 5-10-101; Colorado, Colo Rev Stat 18-3-102 and 18-1.3-401; Delaware, Del Code Ann, tit 11, §§ 636(b)(1) and 4209(a); Florida, Fla Stat 782.04(1)(a) and (b) and 775.082(1)(a); Iowa, Iowa Code 707.2 and 902.1(1); Louisiana, La Stat Ann 14:30; Massachusetts, Mass Gen Laws, ch 265, §§ 1 and 2(a); Minnesota, Minn Stat 609.185 and 609.106; Mississippi, Miss Code Ann 97-3-21; Missouri, Mo Rev Stat 565.020; Nebraska, Neb Rev Stat 28-303 and 29-2520; New Hampshire, NH Rev Stat Ann 630:1-a; North Carolina, NC Gen Stat 14-17(a); Pennsylvania, 18 Pa Cons Stat 2502 and 1102; and South Dakota, SD Codified Laws 22-16-4 and 22-6-1.

[18] 18 USC 1111.

Constitution's mandate forbidding excessively harsh punishment. *In re Monschke*, 197 Wash 2d at 307, 311 & n 6, citing Wash Const 1889, art 1, § 14. The majority of jurisdictions now reflect a society and a criminal-punishment system more "enlightened by a humane justice" than Michigan's current sentencing scheme set forth in this matter. See *Lorentzen*, 387 Mich at 178 (quotation marks and citation omitted).

## 4. THE GOAL OF REHABILITATION

As to the fourth and final *Lorentzen* proportionality factor, it cannot be disputed that the goal of rehabilitation is not accomplished by mandatorily sentencing an individual to life behind prison walls without any hope of release. This is a long-established principle. See *Graham*, 560 US at 74 ("A sentence of life imprisonment without parole, however, cannot be justified by the goal of rehabilitation."). Without hope of release, 18-year-old defendants, who are otherwise at a stage of their cognitive development where rehabilitative potential is quite probable, are denied the opportunity to reform while imprisoned.

Rehabilitation is a specific goal of our criminal-punishment system. *Bullock*, 440 Mich at 34. Indeed, it is the only penological goal enshrined in our proportionality test as a "criterion rooted in Michigan's legal traditions," *Bullock*, 440 Mich at 34, despite the *Lorentzen* Court's clear awareness of those other penological goals cited and relied on by the dissent, *id*. at 34-35; *Lorentzen*, 387 Mich at 180-181. However, the current system of punishment of 18-year-old first-degree murderers to life without the possibility of parole " 'forswears altogether the rehabilitative ideal.' " *Miller*, 567 US at 473, quoting *Graham*, 560 US at 74. And because an 18-year-old defendant has a "child's capacity for change,"

32

as articulated in *Miller*, 567 US at 473, it is particularly antithetical to our Constitution's professed goal of rehabilitative sentences to uniformly deny this group of defendants the chance to demonstrate their ability to rehabilitate themselves. *Bullock*, 440 Mich at 34.

In sum, after considering all four factors of the proportionality test from *Lorentzen* and *Bullock*, we conclude that our Constitution prohibits imposing sentences of mandatory life without parole for 18-year-old defendants convicted of first-degree murder, given that their neurological characteristics are identical to those of juveniles, as articulated in *Miller*, 567 US at 471-479. We hold that Michigan's sentencing scheme mandating that 18-year-old defendants convicted of first-degree murder receive a sentence of life imprisonment without the possibility of parole is cruel or unusual punishment under Const 1963, art 1, § 16.

### E. PARKS'S MANDATORY LIFE-WITHOUT-PAROLE SENTENCE IS UNCONSTITUTIONAL

After committing his crimes at age 18, Parks was automatically sentenced to spend the rest of his life in prison under the first-degree murder statute, MCL 750.316. The sentencing court in this case gave no consideration to any of the attributes of youth that Parks shared with juvenile defendants. Nor was Parks given the same benefit of a specialized procedure under either MCL 769.25a or MCL 769.25 as afforded to juveniles neurologically identical to him. Instead, his sentence was applied automatically. This procedure violates our Constitution and requires that Parks be resentenced.

While Parks argues that the sentence he received is unconstitutional as applied to him because of the mitigating circumstances of his offense and his person, our inquiry today does not require us to examine anything specific to Parks at this juncture. Instead,

33

we hold that it is the application of mandatory life without parole to those 18-year-olds—some of whom will inevitably share the same mitigating characteristics of youth as juveniles—that offends our Constitution, not the application of this sentencing scheme to Parks specifically. In other words, we agree with the Washington Supreme Court that "no meaningful neurological bright line exists between age 17 and age 18"; to treat those two classes of defendants differently in our sentencing scheme is disproportionate to the point of being cruel under our Constitution. See *In re Monschke*, 197 Wash 2d at 326; *Bullock*, 440 Mich at 33-34. Because Parks was not given the benefit of the post-*Miller* and *Montgomery* individualized sentencing procedure enshrined in Michigan law, his mandatory life-without-parole sentence is unconstitutional.

The attributes of youth must be considered to ensure that the sentencing of 18-year-old defendants found guilty of first-degree murder passes constitutional muster. To facilitate this requirement, the same protections provided to juveniles pursuant to MCL 769.25, as described in *Taylor*, ___ Mich ___, must be extended to 18-year-old offenders. This requires that the prosecutor move to sentence these defendants to life without parole under the procedure outlined in the statute and that the sentencing court provide these defendants with a *Miller* hearing before deciding to sentence them to life without parole. See MCL 769.25(2), (3), and (6). Otherwise, such defendants will be sentenced to a term of years in accordance with MCL 769.25(9). We hold that, in order to comport with our Constitution, *all* protections afforded by MCL 769.25 fully apply to 18-year-old

defendants.[19]  Because Parks was sentenced without consideration of the attributes of youth, his sentence is unconstitutional, and he must be resentenced.

### III. CONCLUSION

We hold that mandatorily subjecting 18-year-old defendants convicted of first-degree murder to a sentence of life without parole violates the principle of proportionality derived from the Michigan Constitution, *Lorentzen*, 387 Mich at 176-181; *Bullock*, 440 Mich at 33-34, and thus constitutes unconstitutionally cruel punishment under Const 1963, art 1, § 16.  This renders Parks's automatic sentence of life without parole unconstitutional. Parks and other 18-year-old defendants convicted of first-degree murder are entitled to the full protections of MCL 769.25 and our caselaw, as opposed to the automatic sentencing scheme in MCL 750.316(1).  Therefore, we reverse Part II(B)(4) of the Court of Appeals opinion, vacate Parks's sentence for first-degree murder, and remand this case to the Genesee Circuit Court for Parks to be resentenced.  If the prosecutor intends to move for the imposition of a life-without-parole sentence, the prosecutor shall have 90 days from the date of this opinion to file such a motion.  MCL 769.25(3).  Otherwise, Parks shall be

---

[19] This includes all the protections enumerated in our caselaw interpreting this statute.  The prosecutor will have the burden of proof and persuasion to demonstrate by clear and convincing evidence that an 18-year-old defendant should receive a sentence of life without parole.  See *Taylor*, ___ Mich at ___; slip op at 11.  As with juveniles, the default sentence shall be a term of years, with a minimum sentence of 25 to 40 years' imprisonment and a maximum sentence of at least 60 years' imprisonment.  See *id*. at ___; slip op at 12; MCL 769.25(9).  If the prosecutor elects not to move for life without parole—or does but fails to meet its burden of proof—these defendants should be sentenced to the applicable term of years.  MCL 769.25(4) and (9).  In such sentencing hearings, these defendants are also entitled to have their attributes of youth, such as those described in *Miller*, considered, in accordance with *People v Boykin*, ___ Mich ___; ___ NW2d ___ (2022) (Docket No. 157738), and *People v Tate*, ___ Mich ___; ___ NW2d ___ (2022) (Docket No. 158695).

resentenced to a term of years, pursuant to MCL 769.25(9).  In all other respects, we deny leave to appeal for failure to persuade the Court of the need for review.  On remand, the Genesee Circuit Court shall also redetermine a portion of defendant's restitution order pursuant to the decision of the Court of Appeals.

Elizabeth M. Welch
Bridget M. McCormack
Richard H. Bernstein
Megan K. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                         No. 162086

KEMO KNICOMBI PARKS,

     Defendant-Appellant.

_____

BERNSTEIN, J. (*concurring*).

The United States Supreme Court has held that imposing a sentence of mandatory life imprisonment without the possibility of parole on individuals who were under 18 years old when they committed a crime violates the Eighth Amendment's prohibition on cruel and unusual punishment. See *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012); *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016). Before *Miller*, all offenders in Michigan who were convicted of first-degree murder were sentenced to mandatory life imprisonment without the possibility of parole, regardless of their age. In accordance with United States Supreme Court precedent, the Michigan Legislature has since codified protections for juvenile offenders and enacted a scheme through which juvenile offenders are instead sentenced to a term of years in prison unless the prosecution moves for a sentence of life imprisonment without the possibility of parole and demonstrates that such a sentence is proportional. See MCL 769.25;[1] *People v Boykin*,

_____

[1] MCL 769.25a was passed by the Legislature at the same time as MCL 769.25, but rather than being used to guide the procedure for initial sentencing or resentencing decisions for

___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 157738); slip op at 3-4 (explaining how *Miller* effected MCL 769.25 and how MCL 769.25 operates). The statutory language makes clear that when juvenile offenders are convicted of first-degree murder, the trial court must consider the factors listed in *Miller*, as well as any other relevant criteria, and explain its rationale clearly and specifically on the record before sentencing a juvenile offender to life imprisonment without the possibility of parole. MCL 769.25(6) and (7).

This case asks us to consider whether defendant, who was 18 at the time he committed a crime that resulted in a first-degree murder conviction, is entitled to these same protections. I agree with the majority's thorough analysis of the test outlined in *People v Bullock*, 440 Mich 15; 485 NW2d 866 (1992). Extending the protections offered by MCL 769.25 to 18-year-old offenders fits squarely within what Michigan's Constitution requires under its prohibition against "cruel *or* unusual" punishment. Const 1963, art 1, § 16 (emphasis added). As the majority opinion states, the "cruel or unusual" punishment test is based on proportionality. See *Bullock*, 440 Mich at 32, 40-41. For the reasons explained by the majority, the imposition of mandatory sentences of life imprisonment without the possibility of parole on 18-year-old offenders violates this proportionality principle. Although I concur fully with the majority, I write separately to highlight additional reasons that support this position.

---

juvenile offenders, MCL 769.25a guides the procedure for resentencing juveniles who had been sentenced to mandatory life without parole before its enactment. MCL 769.25a is not relevant to this case because defendant will be resentenced according to MCL 769.25.

## I. MORE LOCAL AND INDIVIDUALIZED CONTROL OVER SENTENCING DECISIONS

Under the new sentencing scheme enacted after *Miller*, when a juvenile offender commits a crime for which a life sentence without the possibility of parole is possible, it is the local prosecutor who must decide whether to pursue such a sentence. MCL 769.25(2). If the local prosecutor believes such a punishment is appropriate, they must file a motion with the court. MCL 769.25(3). The court must then conduct a hearing on that motion. MCL 769.25(6). At that hearing, the local prosecutor is required to prove that the defendant should be sentenced to life imprisonment without the possibility of parole, taking into account the *Miller* factors and all the mitigating and aggravating circumstances relevant to the defendant and the crime. See *People v Taylor*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 154994); slip op at 11 (holding that the burden of proof is on the prosecutor at a hearing held under MCL 769.25). If the prosecutor declines to file such a motion for any defendant of this class, that defendant may only be sentenced to a term of years. MCL 769.25(4); see also *Boykin*, ___ Mich at ___ n 2; slip op at 4 n 2.

Once the local prosecutor makes the decision to pursue a sentence of life imprisonment without the possibility of parole, the authority to make the sentencing decision remains local, because the trial court must then, after hearing and considering all the evidence presented by the prosecution and defendant, decide whether that is a proportionate sentence. If the trial court determines that the local prosecutor has not proven the sentence to be proportionate, the trial court shall impose an appropriate term-of-years sentence. MCL 769.25(9).

3

Understanding how these statutes work is important for understanding what the majority's holding means. It does not mean that we are punishing the most severe crime of first-degree murder less severely. Instead, it means that 18-year-old offenders convicted of the most serious crimes may not be *automatically* sentenced to the harshest sentences without first being afforded an additional layer of process. Local prosecutors may still advocate for youthful offenders to be sentenced to life imprisonment without the possibility of parole, and local trial courts may still agree. This decision merely underscores one of the foundations of a functioning criminal-justice system—that procedure matters for *all* criminal defendants, even those who commit the most serious crimes. See, e.g., *People v Peeler*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 163667) (BERNSTEIN, J., concurring); slip op at 4.

Sentencing youthful offenders who have committed the most serious crimes is an exceptionally daunting task. The Legislature has concluded that the local prosecutor and local trial court should be responsible for making these difficult decisions, and it is these local actors who will be able to make the most informed decisions about individual defendants. Having now decided that there is no meaningful difference between a 17- and 18-year-old offender, this opinion merely requires these local actors to engage in an additional layer of process before sentencing 18-year-old offenders to life imprisonment without the possibility of parole.

## II. PROPORTIONALITY TO THE OFFENSE AND THE OFFENDER

The United States Supreme Court has consistently recognized that "youth matters in sentencing." *Jones v Mississippi*, 593 US at ___, ___; 141 S Ct 1307, 1314; 209 L Ed

4

2d 390 (2021). In several opinions, the Supreme Court has articulated factors, which have colloquially become known as the "*Miller* factors," that sentencing courts must consider before sentencing youthful offenders to life imprisonment without the possibility of parole. As the majority notes, the Supreme Court has grounded these factors in " 'developments in psychology and brain science [that] continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' " *Miller*, 567 US at 471-472, quoting *Graham v Florida*, 560 US 48, 68; 130 S Ct 2011; 176 L Ed 2d 825 (2010). In other words, internal and external factors associated with youthful brains and the juvenile experience mean that such offenders are less culpable or less deserving of the harshest punishments for even the most severe crimes without some individualized consideration of how the *Miller* factors have affected an individual offender.

To provide guidance, the Supreme Court has tried to draw a bright line at age 18 to demarcate the age of maturity, at which point a youthful offender is no longer eligible for these constitutional protections. The Supreme Court first drew this bright line in *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005), holding that the death penalty is prohibited for all offenders under age 18 who are convicted of capital crimes. *Roper* and its progeny show the difficulties and flaws associated with such a bright-line cutoff, and I am concerned that applying a bright line in this way might not be the best approach to resolve the difficult question of how to sentence offenders who commit the most serious offenses.

First, because the federal constitutional protection against cruel and unusual punishments requires analyzing " 'the evolving standards of decency that mark the progress of a maturing society,' " any conclusions that might be drawn could change in a

5

short amount of time. *Id*. at 561, quoting *Trop v Dulles*, 356 US 86, 101; 78 S Ct 590; 2 L Ed 2d 630 (1958). *Roper*, which was decided in 2005, offered a time line for how the Supreme Court arrived at its holding. This history showed that, in 1988, a plurality of the Supreme Court determined that the constitutional standards of decency did not permit the execution of anyone under the age of 16 at the time of a crime. *Roper*, 543 US at 561, citing *Thompson v Oklahoma*, 487 US 815; 108 S Ct 2687; 101 L Ed 2d 702 (1988). The next year, the Supreme Court held that the standards of decency allowed for the imposition of the death penalty for those over 16. *Roper*, 543 US at 562, citing *Stanford v Kentucky*, 492 US 361; 109 S Ct 2969; 106 L Ed 2d 306 (1989). The result of *Thompson* and *Stanford* meant that, by 1989, the bright-line cutoff was established at age 16 for death-penalty cases. On the same day that *Stanford* was decided, the Supreme Court held that the Constitution did not mandate an exemption from the death penalty for offenders with intellectual disabilities. *Roper*, 543 US at 562, citing *Penry v Lynaugh*, 492 US 302; 109 S Ct 2934; 106 L Ed 2d 256 (1989). But by 2002, the same standards of decency had evolved even further, resulting in the holding that the death penalty *was* cruel and unusual for offenders with intellectual disabilities. *Roper*, 543 US at 563, citing *Atkins v Virginia*, 536 US 304; 122 S Ct 2242; 153 L Ed 2d 335 (2002). Likewise, this evolution of the standards of decency led to the holding that the death penalty was cruel and unusual for *all* juvenile offenders, not just those under the age of 16. *Roper*, 543 US at 564, 578.

Over a period of just 16 years, the bright-line cutoff for death-penalty eligibility jumped from age 16 to age 18, and over a period of less than 25 years, the Supreme Court went from allowing the *death penalty* for 17-year-old offenders to holding that mandatory sentences of *life imprisonment without the possibility of parole* are unconstitutionally cruel

6

and unusual for all juvenile offenders. In other words, evolving standards of decency have changed enough to both redefine what type of punishment is viewed as cruel and unusual and the breadth of the class afforded protection from such punishment. These changes show the Supreme Court's continued commitment to reexamine the applicable standards of decency for youthful offenders, which are ever evolving.

Second, *Roper* showed the very flaws associated with drawing a bright line when it noted that

> [d]rawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in *Thompson* drew the line at 16. In the intervening years the *Thompson* plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of *Thompson* extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest. [*Id.* at 574.]

The Supreme Court thus acknowledged that drawing the line at 18 was both overinclusive and underinclusive.

I agree with *Roper* that it was necessary, although difficult, to draw some line as the only way to ensure that a class of youthful offenders would receive constitutional protections against cruel and unusual punishment. However, having a line in place does not mean that such a line should represent both the floor and ceiling of constitutional protections, especially when we already understand that such a line might not be sufficiently protective. There might be a way to both ensure constitutional protections for

7

an entire class of offenders while also mitigating the underinclusiveness problem associated with drawing a line.

Consider, again, the fact that *Roper* believed that the standards of decency for juvenile offenders had evolved because of a parallel evolution of the standards of decency for offenders with intellectual disabilities from *Penry* to *Atkins*. See *Roper*, 543 US at 562-563. *Atkins*, which held that the death penalty was constitutionally impermissible for offenders with intellectual disabilities, contained language that was eventually used in *Miller* to support the holding that mandatory sentences of life imprisonment without the possibility of parole are constitutionally impermissible for juvenile offenders. Again, *Miller* stressed that several factors associated with the underdeveloped brains of juveniles made juvenile offenders less culpable and more capable of rehabilitation than adult offenders. *Atkins* similarly outlined several reasons why offenders with intellectual disabilities were less culpable for their crimes and capable of rehabilitation. *Atkins*, 536 US at 306-307 (explaining that "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses, however, [these offenders] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against [them]"). Still, although *Miller* and *Atkins* use similar language and reasoning, the bright line that *Miller* establishes for juveniles means that under *Miller*, a nonjuvenile offender with an intellectual disability could receive a mandatory sentence of life imprisonment without the possibility of parole and would not have the benefit of a hearing to demonstrate that such a sentence was not proportionate to the offense and the offender. There ought to be a better way to sentence such offenders.

To avoid these downfalls, we could instead consider that all offenders ages 18 and younger have an irrebuttable presumption of youth and diminished capacity, as recognized by the majority opinion. Because the presumption is irrebuttable, all offenders within this class must be afforded the processes outlined in MCL 769.25 before they may be sentenced to life imprisonment without the possibility of parole. However, we could enable defendants who are older than 18 to assert that they possess some qualities—such as an intellectual disability or other mitigating circumstances—that render their brains more like someone who is age 18 or younger. In other words, once offenders reach the age of 19, the irrebuttable presumption of youthfulness would transform into a *rebuttable* presumption of *maturity* and a defendant over the age of 18 would bear the burden of demonstrating the need for a hearing to ensure that a sentence of life without the possibility of parole was proportionate. I believe that the additional process associated with a shifting presumption rather than a bright line would help to alleviate the problem associated with drawing a line that we know will be, at least in part, underinclusive.

In sum, adopting a bright-line rule is likely to leave out some individuals who need additional protections. This effect is consequential, as this cutoff would determine whether a defendant may be *mandatorily* sentenced to life without the possibility of parole and without the opportunity to show that they had diminished culpability. It should be incumbent on us to find a way to ensure that those individuals who are the most vulnerable are able to access sufficient process before they are automatically sentenced to serve their lives in prison. Accordingly, I believe that a better approach to these difficult sentencing decisions would be through a shifting presumption that accounts for relevant individual attributes, rather than a bright-line rule.

9

## III. CONCLUSION

I concur fully with the majority opinion. This result will shift more control over difficult sentencing decisions to local actors, which I believe can only help when making difficult choices on an individualized basis. However, there are problems associated with drawing a bright line under which age is the only criterion in determining whether a mandatory sentence of life without the possibility of parole is cruel or unusual. Accordingly, I believe that a better approach would be to institute a shifting age-based presumption through which offenders could move to seek additional process based on other, non-age-based qualities of diminished culpability, which could entitle some offenders over the age of 18 to the same protections as youthful offenders. Because this case does not present the opportunity for us to reach this issue, I concur with the majority's analysis and conclusion.

Richard H. Bernstein

## STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                          No. 162086

KEMO KNICOMBI PARKS,

      Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

I join Justice CLEMENT's dissenting opinion in full. For the reasons stated in *People v Stovall*, ___ Mich ___, ___ n 24, ___ n 25; ___ NW2d ___ (2022) (Docket No. 162425) (ZAHRA, J., dissenting); slip op at 6 n 24, 10 n 25, I would accept the prosecution's invitation to revisit our caselaw interpreting Const 1963, art 1, § 16—specifically whether Article 1, § 16 provides greater protection than the Eighth Amendment of the United States Constitution and whether Article 1, § 16 contains a proportionality guarantee.

                                                 Brian K. Zahra
                                                 David F. Viviano

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                        No. 162086

KEMO KNICOMBI PARKS,

      Defendant-Appellant.

_____

CLEMENT, J. (*dissenting*).

In *Miller v Alabama*, 567 US 460, 465; 132 S Ct 2455; 183 L Ed 2d 407 (2012), the United States Supreme Court prohibited mandatory life-without-parole (LWOP) sentences for offenders who were *under* 18 years old at the commission of their crime. Defendant asks this Court to extend that rule to offenders who *were* 18 years old at the commission of their crime. Because I do not believe mandatory LWOP as it pertains to 18-year-old offenders is unconstitutional under either the Eighth Amendment or Const 1963, art 1, § 16, I would not do so.

## I. FACTUAL AND LEGAL BACKGROUND

I agree with the majority's recitation of the facts. In short, defendant was 18 years old when he aided and abetted his cousin in committing first-degree murder. The trial court imposed an LWOP sentence, which is mandatory under MCL 750.316(1). Because defendant was 18 years old at the time of his offense, this sentence is not prohibited by *Miller*, 567 US at 465, which held "that mandatory life without parole for those under the

age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " See also *Montgomery v Louisiana*, 577 US 190, 212; 136 S Ct 718; 193 L Ed 2d 599 (2016) (holding that *Miller* was a substantive rule of law that applied retroactively).

Defendant now argues that this Court should extend *Miller*'s prohibition on mandatory LWOP to defendants who were 18 years old when they committed their crimes. He points to two possible bases on which this Court could do so—the first is the Eighth Amendment of the United States Constitution, which prohibits "cruel and unusual punishments,"[1] and the second is Article 1, § 16 of our state Constitution, which prohibits "cruel or unusual punishment."[2] I agree with the majority that the Eighth Amendment does not prohibit defendants who were 18 years old at the time of their crime from being sentenced to mandatory LWOP.[3] But contrary to the majority, I do not believe that Const 1963, art 1, § 16 prohibits that either.

---

[1] US Const, Am VIII ("Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*.") (emphasis added).

[2] Const 1963, art 1, § 16 ("Excessive bail shall not be required; excessive fines shall not be imposed; *cruel or unusual punishment shall not be inflicted*; nor shall witnesses be unreasonably detained.") (emphasis added).

[3] There are several federal decisions declining to extend *Miller*. See, e.g., *United States v Dock*, 541 F Appx 242, 245 (CA 4, 2013); *United States v Davis*, 531 F Appx 601, 608 (CA 6, 2013); *Wright v United States*, 902 F3d 868, 872 (CA 8, 2018); *United States v Sierra*, 933 F3d 95, 97 (CA 2, 2019); *Ong Vue v Henke*, 746 F Appx 780, 783 (CA 10, 2018). See also *Doyle v Stephens*, 535 F Appx 391, 395 (CA 5, 2013) (declining to extend the prohibition on the death penalty for juvenile offenders from *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005)). The only federal case I am aware of that extended the holding of *Miller* was *Cruz v United States*, unpublished opinion of the United States District Court for the District of Connecticut, issued March 29, 2018 (Case No. 11-CV-787). But that opinion was later vacated and remanded by the United States Court of Appeals for the Second Circuit in *Cruz v United States*, 826 F Appx 49, 52 (CA 2, 2020)

## II. ANALYSIS

Whereas the Eighth Amendment prohibits "cruel and unusual punishments," Const 1963, art 1, § 16 prohibits "cruel or unusual punishment." This difference in language has led this Court to interpret our constitutional provision as providing broader protection. *People v Bullock*, 440 Mich 15, 30-35; 485 NW2d 866 (1992).

We presume a statute is constitutional "unless the contrary clearly appears[.]" *Cady v Detroit*, 289 Mich 499, 505; 286 NW 805 (1939). "[I]n case of doubt every possible presumption not clearly inconsistent with the language and the subject matter is to be made in favor of the constitutionality of legislation." *Id.* Specific to the mandatory LWOP sentence at issue here, "[l]egislatively mandated sentences are presumptively proportional and presumptively valid." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011).

## A. THE APPLICATION OF *BULLOCK*'S FOUR-FACTOR TEST

In *People v Lorentzen*, 387 Mich 167; 194 NW2d 827 (1972), and *Bullock*, our Court set forth a four-part test to determine whether a sentence violates Const 1963, art 1, § 16. Under that test, we must consider: (1) "the severity of the sentence imposed compared to the gravity of the offense," (2) "the penalty imposed for the offense compared to penalties imposed on other offenders" in Michigan, (3) "the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states," and (4) "whether the penalty imposed advances the penological goal of rehabilitation."

---

("[W]e conclude that the district court erred when it held that the Eighth Amendment forbids a mandatory life sentence for a defendant who was eighteen at the time of his offense.").

3

*People v Carp*, 496 Mich 440, 520; 852 NW2d 801 (2014), cert gtd and opinion vacated

sub nom on other grounds *Carp v Michigan*, 577 US 1186 (2016), citing *Bullock*, 440 Mich

at 33-34, and *Lorentzen*, 387 Mich at 176-181.

### 1. THE GRAVITY OF THE OFFENSE VERSUS THE SEVERITY OF THE PUNISHMENT

To apply that test, we first consider the gravity of the offense as opposed to the

severity of the punishment. First-degree murder is undoubtedly a very serious offense,

arguably the most serious offense one can commit. Accordingly, a very severe sentence is

proportionate. Mandatory LWOP is, undoubtedly, just that. It is, as the majority notes,

the most severe penalty in Michigan. The punishment fits the crime. As this Court stated

in *Carp*, 496 Mich at 514-515:

> [F]irst-degree murder is almost certainly the gravest and most serious offense that an individual can commit under the laws of Michigan—the premeditated taking of an innocent human life. It is, therefore, unsurprising that the people of this state, through the Legislature, would have chosen to impose the most severe punishment authorized by the laws of Michigan for this offense.[4]

See also *People v Hall*, 396 Mich 650, 657-658; 242 NW2d 377 (1976) (stating that "the

punishment exacted [i.e., mandatory LWOP] is proportionate to the crime [of felony

murder]"). While I do not take the mandatory imposition of LWOP lightly, it is

commensurate with the gravity of the offense in this case.

The majority contends that the penalty is more severe for defendant than it is for

older adults because those who committed crimes at his age are more likely to act recklessly

and to be susceptible to peer pressure, as they are still developing neurologically. They are

---

[4] See also *People v Manning*, 506 Mich 1033, 1035 (2020) (MARKMAN, J., concurring), quoting *Carp*, 496 Mich at 514-515.

4

also more likely to mature and rehabilitate. I do not argue with the science the majority discusses. However, I do not believe that science is sufficient to show that the first factor weighs in favor of finding the penalty unconstitutional.

We are not the first court to consider that young adults are still developing neurologically and still have some juvenile traits. The United States Supreme Court recognized young adults' ongoing neurological development in 2005 in *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005), in which it found that the execution of juvenile offenders was unconstitutional. Tellingly, the Court commented:

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. [*Id.* at 574.]

I find that reasoning persuasive. A line must be drawn, and that line will always lead to some arbitrary results, as there will be no appreciable difference between a person one day before his 18th birthday versus on his 18th birthday—or now, under the majority's holding, one day before his 19th birthday versus on his 19th birthday. Though the age at which society considers a person an adult has changed and is not consistent across every activity, it is still true that 18 is the general age at which society considers someone an adult. *Roper*, 543 US at 574 ("The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.").[5] Even if 18-year-olds are not so well-developed

---

[5] Our Legislature has also set the age of majority for most purposes at the age of 18. See MCL 722.52(1) ("Except as otherwise provided in the state constitution of 1963 and subsection (2), notwithstanding any other provision of law to the contrary, a person who is at least 18 years of age on or after January 1, 1972, is an adult of legal age for all purposes

5

neurologically as 27-year-olds, they are sufficiently neurologically developed to make major decisions about their lives.

Moreover, first-degree murder, in particular, is an obviously serious offense, the gravity of which I believe 18-year-olds are generally more than able to comprehend. Consequently, even given young adults' ongoing neurological development, I still believe that the severity of the punishment fits the gravity of the offense for this class of defendants. This factor weighs in favor of finding the penalty constitutional.

Also, I note that the majority's holding is overbroad when compared to some of the facts it appears to find relevant in regard to the first factor. First, the majority notes that 18-year-olds are uniquely susceptible to peer pressure. However, its holding eliminates mandatory LWOP even in cases in which there is no evidence that a defendant acted as a result of peer pressure. Additionally, the majority emphasizes that defendant was not found guilty as a principal actor but rather as an aider and abettor, noting that defendant's conviction is "based on a theory of aiding and abetting" and that "Parks was not the principal actor in this particular murder . . . ." However, in this context there is no legal difference. MCL 767.39 ("Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense."). I fail to see why the majority mentions defendant's status multiple times when it makes no difference as to defendant's

whatsoever, and shall have the same duties, liabilities, responsibilities, rights, and legal capacity as persons heretofore acquired at 21 years of age.").

legal culpability or to the majority's holding, as the holding is applicable to 18-year-olds who are found guilty as principals.[6]

### 2. SENTENCES IMPOSED IN MICHIGAN FOR OTHER OFFENSES

Second, we consider the sentences we impose for other offenses. I believe this factor also weighs in favor of finding the penalty constitutional. All adults 18 and older who commit first-degree murder face mandatory LWOP. Adults who commit arguably less-serious offenses can also still face mandatory LWOP. As the majority notes, mandatory LWOP is the penalty imposed on adult defendants guilty of first-degree murder, first-degree criminal sexual conduct, and various other offenses committed with an intent to kill or resulting in death. See, e.g., MCL 791.234(6) (listing various offenses subject to mandatory LWOP); MCL 750.316 (first-degree murder); MCL 750.520b (first-degree criminal sexual conduct); MCL 750.16(5) (adulteration of drugs with intent to kill); MCL 750.18(7) (mixing drugs improperly with intent to kill); MCL 750.211a(f) (possession with intent to unlawfully use an explosive device causing death); MCL 333.17764(7) (mislabeling drugs with intent to kill and causing death); MCL 750.200i(2)(e) (possession

---

[6] The majority responds that *Miller* referred to the defendant's role as an aider and abettor. Because I am bound by *Miller*'s interpretation of the Eighth Amendment, *People v Victor*, 287 Mich 506, 514; 283 NW 666 (1939), I express no opinion on the merits of its reasoning. However, our Court is the final arbiter of our state's Constitution. *People v Tanner*, 496 Mich 199, 221-222; 853 NW2d 653 (2014) ("[W]e need not, and cannot, defer to the United States Supreme Court in giving meaning to the [Michigan Constitution]. Instead, it is this Court's obligation to independently examine our state's Constitution to ascertain the intentions of those in whose name our Constitution was 'ordain[ed] and establish[ed].' ") (alterations in original). Though *Miller* referred to the defendant's role as an aider and abettor and proceeded to hold that mandatory LWOP was prohibited for all juvenile offenders, I still believe there is a disconnect between relying on this specific defendant's role—a role with no legal significance—and issuing an opinion that will affect defendants who played a different role.

of a harmful biological, chemical, radioactive, or electronic device resulting in death). Mandatory LWOP for first-degree murder is not out of place when considered alongside the other punishments our state imposes for other offenses.

The majority contends that because of his young age, defendant's life sentence is, practically, longer than the life sentence of an older defendant. Of course it is true that defendant is likely to spend more time imprisoned than an older offender, but we do not generally consider how long a defendant will, as a practical matter, serve a sentence given his or her life expectancy. When appellants fairly frequently contend that their term-of-years sentence is a de facto life sentence because of their more advanced age, our Court and the Court of Appeals routinely reject such arguments.[7] I see no reason why, in that scenario, we would refuse to consider that a term-of-years sentence is a de facto life sentence but, in the instant case, we would consider—relatedly but in reverse—that a particular life sentence is a de facto longer term-of-years sentence than other life sentences.[8]

---

[7] See, e.g., *People v Washington*, unpublished per curiam opinion of the Court of Appeals, issued July 25, 2019 (Docket No. 343987), p 7 (rejecting the defendant's argument that his term-of-years sentence was a de facto life sentence); *People v Williams*, unpublished per curiam opinion of the Court of Appeals, issued February 20, 2018 (Docket No. 335401), p 9 (same).

[8] The majority contends that *Miller* also considered how long juvenile offenders will spend in prison. However, again, while I express no opinion on *Miller*'s merits insofar as we are bound by the United States Supreme Court's decision regarding the scope of the Eighth Amendment, it is up to our Court to interpret Const 1963, art 1, § 16. See note 6 of this opinion. Consequently, I am not persuaded that a line of reasoning is unassailable simply because *Miller* appears to use it as well.

The majority also notes that defendant will spend more time imprisoned than "most of his equally culpable juvenile offenders." However, it is not the case that defendant is as equally culpable as other juvenile offenders. Even if there is no drastic difference between an older 17-year-old and a younger 18-year-old, surely most 18-year-old defendants are more mature than most 17-, or 16-, or 15-year-old defendants. As *Roper* stated, a line must be drawn somewhere. Defendant is older than juvenile offenders guilty of the same crime, and therefore, he is presumably more mature and more culpable.

Related to the need for line-drawing, the majority notes the unfairness that offenders only a few days younger than defendant are sentenced more leniently "despite the two offenders' identical neuroplasticity[.]" But the majority's holding simply replaces that unfairness with another—that now defendants who are 18 years and 364 days old will be sentenced more leniently than defendants who are 19 years old. The majority readily admits that the science does not support that dividing line either.

3. PENALTIES IMPOSED FOR THE SAME OFFENSE IN OTHER JURISDICTIONS

For the third factor we consider the penalties that other jurisdictions impose for first-degree murder. The majority says that this factor is more neutral but weighs slightly in favor of finding the instant penalty unconstitutional. I do not see how that is the case. As the majority notes, 17 other states and the federal government allow mandatory LWOP for offenders who were 18 and older at the commission of the crime.[9] Michigan is hardly an

---

[9] Alabama, Ala Code 13a-6-2(c); Arizona, Ariz Rev Stat Ann 13-1105(D); Arkansas, Ark Code Ann 5-10-101; Colorado, Colo Rev Stat 18-3-102 and 18-1.3-401; Delaware, Del Code Ann, tit 11, §§ 636(b)(1) and 4209(a); Florida, Fla Stat 782.04(1)(a) and (b) and 775.082(1)(a); Iowa, Iowa Code 707.2 and 902.1(1); Louisiana, La Stat Ann 14:30; Massachusetts, Mass Gen Laws, ch 265, §§ 1 and 2(a); Minnesota, Minn Stat 609.185 and 609.106; Mississippi, Miss Code Ann 97-3-21; Missouri, Mo Rev Stat 565.020; Nebraska,

9

outlier. In past cases in which we found sentences unconstitutional, there were few or no states with penalties so harsh as the one we imposed. See *Bullock*, 440 Mich at 40 ("[*N*]*o other state in the nation* imposes a penalty even remotely as severe as Michigan's . . . . Of the remaining 49 States, only Alabama provides for a mandatory sentence of life imprisonment without possibility of parole for a first-time drug offender, and then only when a defendant possesses ten kilograms or more of cocaine.") (quotation marks and citation omitted; emphasis added); *Lorentzen*, 387 Mich at 179 ("*Only one state . . . has as severe a minimum sentence* for the sale of marijuana as Michigan.") (emphasis added).

The majority relies on *In re Monschke*, 197 Wash 2d 305; 482 P3d 276 (2021), in which the Washington Supreme Court extended the prohibition on mandatory LWOP to 20-year-old offenders based on Washington's state constitution. However, the majority does not thoroughly consider the reasoning in *Monschke* in order to determine whether it is persuasive.[10]

I do not find *Monschke*'s reasoning persuasive. Washington has two tests under which it reviews the constitutionality of punishments. Both tests have some overlap with

Neb Rev Stat 28-303 and 29-2520; New Hampshire, NH Rev Stat Ann 630:1-a; North Carolina, NC Gen Stat 14-17(a); Pennsylvania, 18 Pa Cons Stat 2502 and 1102; and South Dakota, SD Codified Laws 22-16-4 and 22-6-1. See also 18 USC 1111(b); 18 USC 5031 (defining "juvenile" as "a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday" and "juvenile delinquency" as "the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult").

[10] See *People v DeRousse*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 358358); slip op at 4 (" 'Caselaw from sister states and federal courts is not binding precedent but may be relied on for its persuasive value.' "), quoting *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 726 n 5; 957 NW2d 858 (2020).

ours. But *Monschke* used neither. First, it has a "proportionality test," which consists of four factors.[11] Three of the four factors of that test are similar (to some extent) to our factors from *Lorentzen* and *Bullock*: "(1) *the nature of the offense*; (2) the legislative purpose behind the habitual criminal statute; (3) *the punishment defendant would have received in other jurisdictions for the same offense*; and (4) *the punishment meted out for other offenses in the same jurisdiction*." *State v Fain*, 94 Wash 2d 387, 397; 617 P2d 720 (1980) (en banc) (emphasis added). If *Monschke* had reached its conclusion after applying these similar factors, its reasoning would perhaps be of some persuasive value in determining whether mandatory LWOP for 18-year-olds violates our Constitution as well. However, *Monschke* did not apply this test.

Washington also has a "categorical bar analysis," which it used in *State v Bassett*, 192 Wash 2d 67, 90; 428 P3d 343 (2018), to hold that juveniles could not be sentenced to LWOP, even if it were not mandatory. That categorical-bar analysis has only two factors, one of which is similar to one of ours. *Id*. at 83 (setting out the categorical-bar test as "(1) *whether there is objective indicia of a national consensus against the sentencing practice at issue* and (2) the court's own independent judgment based on ' "the standards elaborated by controlling precedents and by the [c]ourt's own understanding and interpretation of the [cruel punishment provision]'s text, history, . . . and purpose" ' ") (citation omitted; emphasis added; alterations in original). Again, if *Monschke* had used this test, at least its analysis of its first factor might be persuasive as to our third factor. But *Monschke* did not

---

[11] *Monschke* attributes this test to *State v Fain*, 94 Wash 2d 387, 397; 617 P2d 720 (1980) (en banc).

use that test either. *Monschke*, 197 Wash 2d at 328 ("No [proportionality test] or categorical bar analysis is necessary to reach this decision.").

Instead, the reasons *Monschke* considered were (1) that United States Supreme Court jurisprudence has grown more protective of young offenders, *id*. at 313-317; (2) that courts do not always defer to legislative bright lines when striking down punishments, such as in *Hall v Florida*, 572 US 701; 134 S Ct 1986; 188 L Ed 2d 1007 (2014), *Monschke*, 197 Wash 2d at 317-319; (3) that the age of majority is flexible, depending on context, *id*. at 319-321; and (4) that neurological science reveals no meaningful difference in neurological development between 17- and 18-year-olds, *id*. at 321-325. Those propositions might all be true, but they are not very persuasive in showing that under our four-factor test, mandatory LWOP for 18-year-old offenders violates Const 1963, art 1, § 16.[12]

In any case, the existence of one opinion by one sister state's supreme court hardly sheds much light on whether the third factor—penalties imposed for the same offense in other jurisdictions—weighs in favor of finding the penalty here unconstitutional. That 17 other states and the federal government also have mandatory LWOP for 18-year-old offenders shows quite the opposite.

---

[12] I find it a bit eyebrow-raising that *Monschke* used neither test. Additionally, I believe Justice Owens makes compelling points in her dissent in *Monschke*. Though I consider the critique more thoroughly later in this opinion, most pertinent is that the court failed to respect the legislature's role. See, e.g., *Monschke*, 197 Wash 2d at 341 (Owens, J., dissenting) ("[T]he lead opinion improperly strips the legislature's role in defining the age of majority and replaces it with a handful of scientific studies. The court's second guessing of the legislature is questionable as this court is inferior to the legislature in both time and resources to adequately consider the issue.").

4.  WHETHER THE PENALTY ADVANCES THE GOAL OF REHABILITATION

Finally, we consider whether the punishment helps offenders to rehabilitate. Mandatory LWOP generally does not advance the goal of rehabilitation, as defendant has little realistic chance for parole.  We did remark in *Hall*, 396 Mich at 658, that "rehabilitation and release are still possible, since defendant still has available to him commutation of sentence by the Governor to a parolable offense or outright pardon."  That is true, though I recognize that those are avenues of relief that are unlikely to benefit most prisoners.[13]  Nevertheless, I do note that even if the sentence does not generally facilitate rehabilitation, there are other valid penological goals, such as retribution, deterrence, and incapacitation,[14] which I believe it does facilitate.

The first three factors weigh strongly in favor of the punishment's constitutionality. Though the fourth factor does not weigh in favor of the punishment's constitutionality, for the reasons stated in *Hall*, it does not weigh strongly against its constitutionality either. And to the extent that the fourth factor weighs against the punishment's constitutionality, this factor alone is insufficient to support a determination that mandatory LWOP is unconstitutional.[15]  I thus conclude that mandatory LWOP for 18-year-old offenders does

---

[13] See *Carp*, 496 Mich at 521 (noting that LWOP " 'forswears altogether the rehabilitative ideal' "), quoting *Graham v Florida*, 560 US 48, 74; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

[14] See *Lorentzen*, 387 Mich at 180 (listing rehabilitation, deterrence, and incapacitation as policy factors underlying penalties).

[15] Indeed, if failure to advance the goal of rehabilitation alone were enough to render a punishment unconstitutional, LWOP for defendants of any age would be unconstitutional.

not violate our state Constitution. As such, defendant's sentence should stand, and *Miller*'s protections should not be extended to 18-year-old offenders.

## B. THE MAJORITY'S RELIANCE ON NEUROSCIENCE DEMONSTRATES THAT ITS DECISION IS BASED IN LARGE PART ON POLICY, AND POLICY DECISIONS SHOULD BE LEFT TO THE LEGISLATURE

A striking feature of the majority opinion is its discussion of and reliance on neuroscience. Though courts must consider scientific evidence in some limited contexts,[16] the majority's reliance on scientific evidence to justify its holding is extraordinary, and it signals what I believe is the overarching flaw in the majority's analysis. That flaw is that the majority is viewing the issue at hand not only through a legal lens—which would involve the sources and methods we typically consider, such as caselaw and the rules of statutory construction (as applied to our Constitution in this case)—but the majority is also viewing the issue through a policy lens.[17]

Our Court has long said that it is not for us to decide policy issues; those questions should be left to the Legislature.[18] In 1860, our Court noted that "[t]he expediency or

---

[16] One example of when courts must consider scientific evidence is when determining whether evidence is admissible under MRE 702. MRE 702 ("If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.").

[17] The majority contends that *Miller* also looked at scientific evidence. However, that is not enough reason to make me abandon my critique of how the majority interprets our Constitution. See notes 6 and 8 of this opinion.

[18] *People v Collins*, 3 Mich 343, 348 (1854) (opinion of GREEN, P.J.) ("The Legislature may have acted very unwisely, and departed in our opinion, very widely from that line of policy which the interest of the State demands; yet if they have acted within the scope of

14

the powers conferred upon them by the Constitution, this tribunal has no authority to nullify their acts, or to restrain the free exercise of their legislative discretion."); *id*. at 398 (opinion of Pratt, J.) ("As to the policy and expediency of a statute, Courts have nothing to do[.]"); *People ex rel Whipple v Auditor General*, 5 Mich 193, 200-201, 203 (1858) ("But any question of mere policy can throw but little light on the proper construction of this Constitution. It must be construed by its language and the changes made by it in our then existing system. All other guides must be uncertain."); *Cady v Detroit*, 289 Mich 499, 509; 286 NW 805 (1939) ("Courts cannot substitute their opinions for that of the legislative body on questions of policy."); *French v Ingham Co*, 342 Mich 690, 700; 71 NW2d 244 (1955) ("It is well settled that a court is without authority to pass on the wisdom, policy, or equity of a statute."); *Lansing v Lansing Twp*, 356 Mich 641, 648; 97 NW2d 804 (1959) ("The mere fact a statute appears impolitic or unwise is not sufficient for judicial construction but is a matter for the legislature."); *People v McIntire*, 461 Mich 147, 158; 599 NW2d 102 (1999) ("Thus, while the [Court of Appeals] majority makes compelling arguments that support a rational, but different, policy choice . . . , the object of judicial statutory construction is not to determine whether there are valid *alternative* policy choices that the Legislature may or should have chosen, but to determine from the text of the statute the policy choice the Legislature *actually* made.") (quotation marks and citation omitted; alteration in original); *Mayor of Lansing v Pub Serv Comm*, 470 Mich 154, 161; 680 NW2d 840 (2004) ("We have observed many times in the past that our Legislature is free to make policy choices that, especially in controversial matters, some observers will inevitably think unwise. This dispute over the wisdom of a law, however, cannot give warrant to a court to overrule the people's Legislature."), superseded by statute on other grounds, as stated in *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349 (2018); *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 589; 702 NW2d 539 (2005) ("The majority believes that policy decisions are properly left for the people's elected representatives in the Legislature, not the judiciary."); *Johnson v Recca*, 492 Mich 169, 187; 821 NW2d 520 (2012) ("This Court only has the constitutional authority to exercise the 'judicial power.' '[O]ur judicial role "precludes imposing different policy choices than those selected by the Legislature . . . ." ' 'Whether or not a statute is productive of injustice, inconvenience, is unnecessary, or otherwise, are questions with which courts . . . have no concern.' ") (citations omitted); *People v Harris*, 499 Mich 332, 345; 885 NW2d 832 (2016) ("Our role as members of the judiciary is not to second-guess those policy decisions or to change the words of a statute in order to reach a different result."); *People v Betts*, 507 Mich 527, 565; 968 NW2d 497 (2021) ("We decline to encroach on the Legislature's plenary authority to create law or on its role in shaping and articulating policy by choosing among the plethora of possibilities."). See also 5 Smith & Philbin, Michigan Civil Jurisprudence (April 2022 update), Constitutional Law, § 48 ("Legislative enactments, as they bear on a matter of public policy, are conclusive; indeed, it is fundamental that courts may not substitute their judgment for that of the legislature.") (citations omitted).

policy of the statute has nothing to do with its constitutionality[.]" *Tyler v People*, 8 Mich 320, 333 (1860). More recently, in *People v Harris*, 499 Mich 332, 356, 358; 885 NW2d 832 (2016), we reiterated:

> [O]ur statutory analysis is controlled by principles of interpretation, not palatability of outcomes. It is not our role to rewrite the law or substitute our own policy judgment in the face of the text of the statute . . . .
>
> * * *
>
> > [I]n our democracy, a legislature is free to make inefficacious or even unwise policy choices. The correction of these policy choices is not a judicial function as long as the legislative choices do not offend the constitution. Instead, the correction must be left to the people and the tools of democracy: the ballot box, initiative, referendum, or constitutional amendment.
>
> [*Id.* (second alteration by the *Harris* Court), quoting *People v McIntire*, 461 Mich 147, 159; 599 NW2d 102 (1999).]

I wholeheartedly believe that to be true. We must not strike down a statute because we disagree with the Legislature's policy choice. Indeed, leaving policy to the legislative branch is a mainstay of the country's jurisprudence, not just that of our Court. Several of the leading national treatises contain the same instruction that courts should refrain from policymaking.[19]

---

[19] See, e.g., 16 CJS (May 2022 update), Constitutional Law, § 426 ("It is for the legislature to determine the justice, wisdom, necessity, desirability, or expediency of a law which is within its powers to enact, and such questions are not open to inquiry by the courts. It is not the province of a court to question the wisdom, social desirability, or economic policy underlying a statute as these are matters for the legislature's determination. It is the court's province to determine only the applicability, legality, and constitutionality of a statute. When searching for legislative intent, a court's duty is simply to construe the legislative will as the court finds it, without regard to the court's own views as to the wisdom or justice of the statute.") (citations omitted); 16A Am Jur 2d (May 2022 update), Constitutional Law, § 184 ("[A]ll questions of policy, including changes in policy, are for the determination of the legislature and not for the courts. If Congress' coverage decisions are

The principle that courts should leave policy decisions to the legislative branch is based in separation-of-powers concerns. See Const 1963, art 3, § 2 ("The powers of government are divided into three branches: legislative, executive and judicial. *No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.*") (emphasis added). Under that doctrine, the judiciary should not take on a legislative role by engaging in policymaking.[20] Additionally, the Legislature is, as a practical matter, better able to weigh policy concerns.[21] It is the more democratic institution that better reflects the will of the voters.[22]

mistaken as a matter of policy, it is for Congress to change them; the Supreme Court should not legislate for them. When reviewing for constitutional unreasonableness, the judiciary must give great deference to legislative action and should not substitute its own public policy judgments for that of the enacting body. In short, public policy is not a basis for declaring a statute unconstitutional.") (citations omitted); 16A Am Jur 2d (May 2022 update), Constitutional Law, § 281 ("A fundamental principle of the constitutional separation of powers among the three branches of government is that the legislative branch is the ultimate arbiter of public policy. Thus, the determination of public policy lies almost exclusively with the legislature, and courts will not interfere with that determination in the absence of palpable errors. A court must interpret and apply statutes in the manner in which they are written and cannot rewrite them to comport with the court's notions of orderliness and public policy.") (citations omitted). See also *Miller*, 567 US at 493 (Roberts, C.J., dissenting) ("Determining the appropriate sentence for a teenager convicted of murder presents grave and challenging questions of morality and social policy. Our role, however, is to apply the law, not to answer such questions.").

[20] See *Kyser v Kasson Twp*, 486 Mich 514, 536; 786 NW2d 543 (2010) ("[P]olicy-making is at the core of the legislative function.").

[21] *Devillers*, 473 Mich at 589 ("The Legislature, unlike the judiciary, is institutionally equipped to assess the numerous trade-offs associated with a particular policy choice."); *People v Steanhouse*, 500 Mich 453, 483-484; 902 NW2d 327 (2017) (LARSEN, J., concurring) (stating that the Legislature "is certainly better equipped than this Court to weigh the policy options").

[22] See *Miller*, 567 US at 515 (Alito, J., dissenting) ("When a legislature prescribes that a category of killers must be sentenced to life imprisonment, the legislature, which

It is better able to consider scientific evidence and weigh competing interests.[23] Unlike the Legislature, the judiciary resolves disputes between parties. That function does not easily translate to evaluating the strength of scientific claims.[24] Despite the decades of legal experience the justices on this Court have, I do not believe we are well-suited for this foray into neuroscience.

I understand that it is the Court's responsibility to judge whether penalties violate our Constitution's "cruel or unusual punishment" clause and that, in the abstract, doing so and striking down a penalty as unconstitutional does not necessarily mean that the Court is impermissibly treading into the policy realm. The majority, of course, does not simply say that it finds mandatory LWOP for 18-year-old offenders unsavory and unscientific, but

---

presumably reflects the views of the electorate, is taking the position that the risk that these offenders will kill again outweighs any countervailing consideration, including reduced culpability due to immaturity or the possibility of rehabilitation. When the majority of this Court countermands that democratic decision, what the majority is saying is that members of society must be exposed to the risk that these convicted murderers, if released from custody, will murder again.").

[23] See *Henry v Dow Chem Co*, 473 Mich 63, 92 n 24; 701 NW2d 684 (2005) (" '[Legislatures] can gather facts from a wide range of sources to help lawmakers decide whether the law should be changed and, if so, what sorts of changes should be made.' "), quoting Schwartz & Lorber, State Farm v. Avery*: State Court Regulation Through Litigation Has Gone Too Far*, 33 Conn L Rev 1215, 1219 (2001); *Henry*, 473 Mich at 91 (explaining that balancing competing interests is "a task more appropriate for the legislative branch than the judiciary").

[24] *Betts*, 507 Mich at 584 (VIVIANO, J., concurring in part and dissenting in part) ("Given the nature of our role of adjudicating individual disputes and the consequent institutional limitations this role entails, we must exercise 'humility about the capacity of judges to evaluate the soundness of scientific and economic claims[.]' Barrett, *Countering the Majoritarian Difficulty*, 32 Const Comment 61, 74 (2017) (reviewing Barnett, *Our Republican Constitution: Securing the Liberty and Sovereignty of We the People* (New York: HarperCollins, 2016)).") (alteration in original).

rather applies the relevant factors from *Lorentzen* and *Bullock*. For the reasons outlined in this opinion, I strongly disagree with how the majority applies those factors, especially the majority's overreliance on neuroscience. As a result, I view the majority's decision as replacing a constitutional penalty with a penalty that the majority believes is better policy. This not only usurps the Legislature's role but also overrides the policy choice of the framers, whose Constitution, I believe, would permit the instant penalty. Justice Thomas M. Cooley warned against this kind of judicial overreach:

> What is right, what is expedient, what is proper, what constitute the inalienable rights of individuals, and what is necessary to be inserted in their constitution of government to protect them, the people who frame it must judge, and not generally he who, under it, is vested with executive or judicial functions. [Cooley, *Preface: With Some Considerations Regarding the Study of the Law*, in 1 Blackstone, Commentaries on the Laws of England, x (Chicago: Callaghan & Cockcroft, 1871).]

Moreover, insofar as the majority's holding is a policy decision, it is one for which there is no clear limiting principle. I would not be surprised if the Court extends its current line in the near future. The science defendant offers indicates that there is significant neurological development until age 25, and while the majority acknowledges this science, the majority today extends *Miller*'s and *Montgomery*'s holdings only to offenders who are 18 years old. I assume that in the coming years we will hear cases arguing that we should extend *Miller*'s protection to those in their early twenties as well. Relatedly, if mandatory LWOP is unconstitutional for 18-year-olds guilty of first-degree murder, surely it would be unconstitutional for 18-year-olds guilty of other offenses as well. And as our understanding of neurological development continues to evolve in the future, must we reevaluate the line between youth and adulthood every few years? Should we begin to

19

consider any other factors that might affect adult brain function?  Young adults are, after all, not the only ones subject to factors that cloud their reasoning—indeed, we are all subject to cognitive biases to different extents.[25]  Other groups, such as older adults, may also have neurological factors that impair their decision-making.[26]

It is up to the Legislature to balance the science with society's penological goals, i.e., "rehabilitation of the individual offender, society's need to deter similar proscribed behavior in others, and the need to prevent the individual offender from causing further injury to society." *Lorentzen*, 387 Mich at 180.  But I fear that the majority's opinion is the first step in making it the Court's ongoing task to reconcile the Legislature's sentencing scheme with every jot and tittle of new scientific evidence.  While it's understandable to want our law to be in line with the most recent scientific understanding, I believe it is also important for the court system and society to have stability.  That stability is now thrown into question, as we face a future of frequently changing constitutional lines.

## III.  CONCLUSION

I take no issue with the scientific propositions that defendant raises.  However, evaluating that scientific evidence is a task I believe is outside this Court's wheelhouse.

---

[25] See, e.g., Kahneman, *Thinking, Fast and Slow* (New York: Farrar, Straus and Giroux, 2011).

[26] See, e.g., Strough & Bruine de Bruin, *Decision Making Across Adulthood*, 2 Ann Rev Developmental Psychol 345, 357 (2020) ("Age-related declines in fluid reasoning ability and working memory can compromise the quality of older adults' decision making when decisions are complex.") (citation omitted), available at <https://www.researchgate.net/profile/Jonell-Strough/publication/346126073_Decision_Making_Across_Adulthood/links/6025da9aa6fdcc37a81d5a31/Decision-Making-Across-Adulthood.pdf?_sg%5B0%5D=started_experiment_milestone&origin=journalDetail> (accessed July 18, 2022) [https://perma.cc/C3T9-B4EY].

Rather than playing amateur scientists, I believe that the judiciary should focus on interpreting and applying the law. Applying the relevant law here, I do not believe that the factors from *Lorentzen* and *Bullock* weigh against the constitutionality of mandatory LWOP for 18-year-old offenders. As such, I believe that we should respect the Legislature's constitutional choice of penalty rather than impose our own.

Elizabeth T. Clement
Brian K. Zahra
David F. Viviano
